# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 2, 2010

No. 09-20702

Lyle W. Cayce
Clerk

AMAZING SPACES, INC.,

Plaintiff - Appellant

v.

METRO MINI STORAGE; LANDMARK INTEREST CORPORATION,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before KING, WIENER, and DENNIS, Circuit Judges.

KING, Circuit Judge:

Amazing Spaces, Inc., and Metro Mini Storage are rival self-storage businesses in Houston, Texas. Amazing Spaces brought this action against Metro and Landmark Interest Corporation, a construction company, alleging infringement of a star design that it claims as a service mark. The district court concluded that the design was not a legally protectable mark and dismissed Amazing Spaces's claims on summary judgment. We agree that the design was not legally protectable, and we affirm the judgment dismissing Amazing Spaces's service mark infringement claims. However, we also conclude that the district court erred in dismissing Amazing Spaces's claims relating to infringement of its trade dress, and we reverse and remand for further proceedings.

No. 09-20702

## I. BACKGROUND

Amazing Spaces and Metro compete directly with each other in providing self-storage services in Houston, Texas. Landmark has built facilities for both Amazing Spaces and Metro. Amazing Spaces claims, in connection with providing storage services, exclusive use rights in a design consisting of a raised, five-pointed star set within a circle (the "Star Symbol"), a copy of which is attached as an appendix to this opinion.[1] Metro uses a similar star design on its buildings. In response to this use, Amazing Spaces brought suit against Metro and Landmark in federal district court, alleging federal and state causes of action.[2] With respect to the Star Symbol alone, Amazing Spaces brought a federal claim for service mark infringement under the Lanham Act and state law claims for common law infringement and statutory dilution. With respect to its trade dress, of which the Star Symbol comprises one element, Amazing Spaces brought federal claims for trade dress infringement under the Lanham Act and copyright infringement and state law claims for common law unfair competition and statutory dilution.

Amazing Spaces was founded in 1998 by Scott and Kathy Tautenhahn, and it currently operates three storage facilities in the greater Houston area.

---

[1] The parties and the district court used varying terminology in describing the design at issue. Amazing Spaces refers to it as the "Star Logo," Metro refers to it as the "Texas Star," and the district court's opinion refers to it as the "star mark." Except where alluding to a different design or quoting from either the parties or the district court, we will employ the term "Star Symbol."

[2] The federal claims are for service mark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114, trade dress infringement under § 43 of the Lanham Act, 15 U.S.C. § 1125, and copyright infringement based on trade dress under 17 U.S.C. § 501. The state law claims are for service mark and trade dress dilution under Texas's anti-dilution statute, TEX. BUS. & COM. CODE ANN. § 16.29 (Vernon 2002), common law service mark infringement, and common law unfair competition relating to trade dress.

No. 09-20702

The facilities opened in 1998, 2001, and 2006, respectively. Landmark was hired to build each of these facilities and, at Amazing Spaces's request, installed the Star Symbol under the peaks of the facilities' gabled roofs. Amazing Spaces has used the Star Symbol in its facilities' architecture and in its advertising, and it claims to have done so since at least April 1998. One trade magazine has recognized Amazing Spaces for its storage services, and the magazine displayed the Star Symbol in connection with the accompanying article. Amazing Spaces has also used the Star Symbol to designate the locations of its facilities on maps, and it claims to have directed customers—through telephone advertisements—to "look for the star."

The Star Symbol is registered as a service mark with the United States Patent and Trademark Office (PTO). Prior to applying for registration, Amazing Spaces engaged a company to perform a database search to determine whether other storage companies had registered a similar star mark; the search revealed no such registrations. Amazing Spaces's application stated that it believed no other person or business was entitled to use the Star Symbol or a deceptively similar design as a mark for storage services. On July 6, 2004, the PTO issued U.S. Service Mark Registration No. 2,859,845 (the "'845 Registration") for the Star Symbol; we have attached the '845 Registration as an appendix to this opinion. Amazing Spaces also holds a registration for another design (the "Peaks and Sky Symbol") that features a series of roof peaks, including stars on the gables, placed below a sky expanse, with the words "AMAZING SPACES" underneath.

Landmark has also constructed self-storage facilities for Metro; these facilities feature a similar five-pointed-star-in-a-circle design (but not raised) on

their gables.  Despite Amazing Spaces's demand that Metro cease its use of a star, Metro continued to use its design and remodeled existing facilities to include the design.  According to Amazing Spaces, this has caused confusion among its customers, who mistook Metro's facilities for new Amazing Spaces facilities.  According to Kathy Tautenhahn, existing or prospective customers have inquired about whether new Amazing Spaces facilities had opened where Metro facilities were located.  The record also includes a declaration from a customer to similar effect.

Prior to this lawsuit, Amazing Spaces had, at one other time, threatened legal action against a rival self-storage business for using a star design on its buildings.  However, the matter never culminated in a lawsuit: Community Self Storage removed its star design in response to Amazing Spaces's demands.  In the present case, Amazing Spaces has submitted a declaration by its alarm technician that the technician was confused by the appearance of Community's facility and believed it to be an Amazing Spaces facility.

Unlike Community, however, and as mentioned above, Metro refused to cease using its star design, and Amazing Spaces proceeded to file the lawsuit at issue. Metro and Landmark each filed an answer, asserting various affirmative defenses and counterclaims.  One of these counterclaims was a request that the trademark be canceled for invalidity.  The district court recognized early on that "[t]here does seem to be a question about the trademarkability of the Texas star logo."  Accordingly, the court ordered discovery to proceed in stages, with the first stage limited to "the threshold issues raised by the 'trademarkability' of the Texas star and similar issues affecting copyright and trade dress."

No. 09-20702

Following discovery, Metro[3] moved for summary judgment on the ground that the Star Symbol was not a valid service mark. It argued primarily that the Star Symbol was not inherently distinctive and that Amazing Spaces could not establish that it had acquired secondary meaning. It supported this contention by presenting evidence that the same or a similar five-pointed star was used in commerce "in at least 63 different industries and businesses on buildings, property, and as part of logos" and on the buildings of "at least 28 other self-storage locations." *Amazing Spaces, Inc. v. Metro Mini Storage*, 665 F. Supp. 2d 727, 738 (S.D. Tex. 2009).[4] The court concluded that "[t]he ubiquitous nature of the five-pointed star set within a circle precludes a finding that it is inherently distinctive or that it can serve as an indicator of origin for a particular business," *id.*, and that "the record d[id] not raise a fact issue material to determining whether the star mark has acquired distinctiveness through a secondary meaning," *id.* at 742.

In determining whether the Star Symbol was inherently distinctive, the district court considered two tests. *See id.* at 735–36. The first is known as the *Abercrombie* test, after Judge Friendly's opinion in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976). Under this test, marks are "classified in categories of generally increasing distinctiveness . . . [:] (1) generic;

---

[3] Although Metro and Landmark play distinct roles in Amazing Spaces's allegations of infringement, they asserted the same arguments at the summary judgment stage and now assert the same arguments on appeal. Thus, for ease of reference, unless we note otherwise or it is made apparent from context, further references in this opinion to Metro extend to Landmark as well.

[4] Metro submitted an affidavit from the former owner of one such storage facility attesting to the use of a raised, five-pointed star within a circle on the storage facility—on walls and on gables beneath roof peaks—prior to April 1998.

No. 09-20702

(2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citing *Abercrombie*, 537 F.2d at 9). The second test was articulated in *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342 (C.C.P.A. 1978). Under the *Seabrook Foods* test, courts look to a set of factors "[i]n determining whether a design is arbitrary or distinctive":

> [1] whether it was a "common" basic shape or design, [2] whether it was unique or unusual in a particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [4] whether it was capable of creating a commercial impression distinct from the accompanying words.[5]

*Id.* at 1344 (footnotes omitted).

After laying out the two tests, the district court proceeded to consider their application to the Star Symbol. It first determined that the Star Symbol was not generic or a common geometric shape. *Amazing Spaces*, 665 F. Supp. 2d at 737. It then determined that the Star Symbol was not descriptive of any "characteristic or quality of self-storage service[s]." *Id.* For essentially the same reason, and because Amazing Spaces disclaimed any argument to the contrary, the court further concluded that the Star Symbol was not suggestive. *Id.* Under the *Abercrombie* rubric, this process of elimination left only two possibilities remaining: the Star Symbol was either arbitrary or fanciful. Both of those "categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos*, 505 U.S. at 768. However, the district court refused

---

[5] The district court did not discuss the fourth factor, presumably because that factor contemplates a design accompanied by words. *See Amazing Spaces*, 665 F. Supp. 2d at 736.

to reach such a conclusion, stating that "the star mark cannot be classified as arbitrary or fanciful unless it is inherently distinctive so as to serve as a source identifier for Amazing Spaces." *Amazing Spaces*, 665 F. Supp. 2d at 737.

The district court then proceeded to assess the inherent distinctiveness of the Star Symbol under the *Seabrook Foods* test, inquiring "whether the star mark is 'so unique, unusual or unexpected' in the self-storage industry that 'one can assume without proof that it will automatically be perceived by customers as an indicator of origin.'" *Id.* (quoting 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8:13, at 8–58.5 (4th ed. 2002) (hereinafter "MCCARTHY ON TRADEMARKS"). Responding to the parties' dispute over which Houston-area self-storage company first used a star design, the court determined that "[r]egardless of whether Amazing Spaces was the first self-storage business to use the star mark—at least in the Houston area—the mark is not inherently distinctive and does not act as an indicator of origin for any self-storage business, including Amazing Spaces." *Id.* at 738. The court reached this conclusion based on the fact that "[a] five-pointed star set within a circle is a common symbol long associated with Texas" and was used by numerous businesses, including self-storage businesses. *Id.* According to the district court, "[t]he ubiquitous nature of the five-pointed star set within a circle precludes a finding that it is inherently distinctive or that it can serve as an indicator of origin for a particular business." *Id.*

Having concluded that the Star Symbol was not inherently distinctive, the district court next examined whether the summary judgment record raised a fact issue regarding secondary meaning. *See id.* at 739. The court noted that the inquiry was primarily an empirical one, with survey evidence providing the best

evidence and other evidence—such as length and manner of the mark's use, nature and extent of advertising and promotion of the mark, sales volume, actual confusion, and the defendant's intent—also bearing on the matter. *Id.* at 739–40. The district court found that no fact issue had been raised regarding secondary meaning because Amazing Spaces had not submitted any survey evidence, the advertising primarily involved a different design of which the Star Symbol was only a minor part, and the evidence of actual confusion involved the Star Symbol only in conjunction with architectural similarities in the buildings. *Id.* at 741–42.

Final judgment was entered by separate order on September 28, 2009. That judgment explained, "For the reasons stated in this court's Memorandum and Opinion entered this date, this action is dismissed with prejudice." The judgment had the effect of dismissing Amazing Spaces's entire case and did not differentiate the claims based on the Star Symbol from those based on its trade dress, of which the Star Symbol is merely one element. On October 19, Amazing Spaces filed a notice of appeal from the district court's judgment dismissing its action with prejudice.[6]

---

[6] There was some confusion relating to Amazing Spaces's notice of appeal, but we discern no jurisdictional difficulties with proceeding on this case. On October 9, 2009, Metro moved before the district court for further relief, requesting an order canceling the '845 Registration. This was necessary because the district court had denied the motion for summary judgment on Metro's affirmative defenses and counterclaims as moot. *See id.* at 742. Ten days later, Amazing Spaces filed its notice of appeal. On November 17, Metro moved before this court for an order directing the district court to correct its judgment under Rule 60(a) of the Federal Rules of Civil Procedure and cancel the '845 Registration. We denied that motion on December 21. On appeal, neither party asserts that the district court's judgment was not a final judgment, and we do not construe Metro's motion as undermining the effectiveness, under Rule 4(a)(4)(A) of the Federal Rules of Appellate Procedure, of Amazing Spaces's notice of appeal.

No. 09-20702

## II. STANDARD OF REVIEW

"We review a district court's grant of summary judgment de novo." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.* (*Smack Apparel*), 550 F.3d 465, 474 (5th Cir. 2008) (citing *Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 645 (5th Cir. 2008)), *cert. denied*, 129 S. Ct. 2759 (2009). Summary "judgment . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). "'We are obliged to construe all the evidence and reasonable inferences deduced therefrom in a light most favorable to . . . the nonmoving party in the court below.'" *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009) (alteration omitted) (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1260 (5th Cir. 1991)).

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.

9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations, footnote, emphasis, and quotation marks omitted).

Whether a mark is inherently distinctive and whether it has acquired secondary meaning are questions of fact. *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 537 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001). Nevertheless, "summary judgment may be upheld if the summary judgment record compels the conclusion that the movant is entitled to judgment as a matter of law." *Smack Apparel*, 550 F.3d at 474 (citing *Beef/Eater Rests., Inc. v. James Burrough Ltd.*, 398 F.2d 637, 639 (5th Cir. 1968)).

A district court's grant of summary judgment may be affirmed "based on any rationale presented to the district court for consideration and supported by facts uncontroverted in the summary judgment record." *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 887 (5th Cir. 2002) (citing *Williams v. Int'l Bhd. of Elec. Workers* (*In re Williams*), 298 F.3d 458, 462 (5th Cir. 2002); *Grenier v. Med. Eng'g Corp.*, 243 F.3d 200, 207 (5th Cir. 2001)); *accord Conkling v. Turner*, 18 F.3d 1285, 1296 n.9 (5th Cir. 1994) ("This court may affirm a grant of summary judgment on any appropriate ground that was raised to the district court and upon which both parties had the opportunity to introduce evidence." (citing cases)).

## III.  DISCUSSION

In reviewing the parties' dispute over whether summary judgment was proper in this case, we first consider the issue addressed by the district court's opinion below—whether the Star Symbol is legally protectable as a service mark. We then evaluate whether summary judgment was appropriately granted on

No. 09-20702

Amazing Spaces's trade dress claims as well.

## A.    The Star Symbol

Trademark and service mark infringement claims are governed by the Trademark Act of 1946 (Lanham Act), 15 U.S.C. §§ 1051 *et seq.*[7]  There are two elements to a successful infringement claim under the Lanham Act.[8]  *Smack*

---

[7] We note that Amazing Spaces brought claims under the Lanham Act and Texas law. The analysis with respect to Amazing Spaces's claims under the Lanham Act will be dispositive of its corresponding claims under Texas law as well.  "A trademark infringement and unfair competition action under Texas common law presents essentially 'no difference in issues than those under federal trademark infringement actions.'" *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 n.3 (Tex. App.—Austin 2001, pet. denied) (quoting *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ)).  Nor does Amazing Spaces suggest that the analysis under the Lanham Act will not also dispose of its service mark dilution claim under the Texas anti-dilution statute.  In any event, the arguments on appeal are framed solely in terms of federal law, and we address them accordingly.  *See AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 n.6 (11th Cir. 1986) (analyzing only federal Lanham Act claims where the district court and the parties had not separately addressed the plaintiff's state law claims).

[8] Amazing Spaces has asserted claims for infringement of its registered Star Symbol and its unregistered trade dress.  The Lanham Act provides separate causes of action for infringement of a registered mark and an unregistered mark.  The relevant portion of § 32, dealing with registered marks, provides:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter

No. 09-20702

*Apparel*, 550 F.3d at 474.  The plaintiff must first "establish ownership in a legally protectible mark, and second, . . . show infringement by demonstrating a likelihood of confusion."  *Id.* (citing *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008)); *accord Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (per curiam) ("To succeed in a trademark infringement claim, a party must first show that it has a protectable right in the mark and, second, show that there is a likelihood of confusion between the marks." (citing *Security Ctr., Ltd. v. First Nat'l Security Ctrs.*, 750 F.2d 1295, 1298 (5th Cir. 1985))).  The district court's opinion granting summary

---

provided.

Lanham Act § 32, 15 U.S.C. § 1114(1).  The Lanham Act provides a cause of action for infringement of an unregistered mark in § 43(a):

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Lanham Act § 43(a)(1), 15 U.S.C. § 1125(a)(1).  Although the Lanham Act separately establishes these causes of action, "[t]he same tests apply to both trademarks and trade dress to determine whether they are protectible and whether they have been infringed, regardless of whether they are registered or unregistered." *Pebble Beach*, 155 F.3d at 536 (citing *Two Pesos*, 505 U.S. at 768–70, 773–74; *Sunbeam Prods., Inc. v. W. Bend Co.*, 123 F.3d 246, 251 n.4 (5th Cir. 1997), *abrogated on other grounds by TrafFix Devices*, 532 U.S. 23).

No. 09-20702

judgment dealt solely with the threshold inquiry regarding whether the Star Symbol was legally protectable as a mark and pretermitted discussing the likelihood of confusion element.

In reviewing whether the Star Symbol qualifies for protection as a mark, we begin with the definitions provided by the Lanham Act. Section 45 of the Lanham Act[9] separately defines "trademark" and "service mark," but the terms essentially include:

> any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods [or services] . . . from those manufactured or sold [or provided] by others and to indicate the source of the goods [or services], even if that source is unknown.[10]

---

[9] We note that the Lanham Act has been substantially revised since its passage in 1946. Our citations of provisions of the Lanham Act are meant to refer to the provisions currently in force and not to the statute's original text.

[10] The complete definition of the term "trademark" in § 45 provides:

The term "trademark" includes any word, name, symbol, or device, or any combination thereof—

> (1) used by a person, or

> (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

Lanham Act § 45, 15 U.S.C. § 1127. The complete definition of a "service mark" provides:

The term "service mark" means any word, name, symbol, or device, or any combination thereof—

> (1) used by a person, or

> (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique

13

No. 09-20702

Lanham Act § 45, 15 U.S.C. § 1127; *accord Two Pesos*, 505 U.S. at 768 ("In order to be registered [and thus legally protectable], a mark must be capable of distinguishing the applicant's goods from those of others." (citing Lanham Act § 2, 15 U.S.C. § 1052)). "To be protectable, a mark must be distinctive . . . ." *Am. Rice*, 518 F.3d at 329; *accord* RESTATEMENT § 13 cmt. a, at 105 ("[A] designation is protectable as a trademark . . . only if the designation is 'distinctive.'"); 1 MCCARTHY ON TRADEMARKS § 3:1, at 3–3 ("In determining what can qualify as a trademark, it is crucial that the symbol in question be so distinctive that it is capable of performing the function of identifying and distinguishing the goods that bear the symbol.").

> [A] mark can be distinctive in one of two ways. First, a mark is inherently distinctive if its intrinsic nature serves to identify a particular source. . . . Second, a mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.

---

service, from the services of others and to indicate the source of the services, even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

*Id.* Although trademarks and service marks are separately defined, their definitions under the Lanham Act closely track each other, and the cases construing the two terms inform our analysis equally. *See Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 841 n.2 (5th Cir. 1990); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 9 cmt. f, at 82 (1995) (hereinafter "RESTATEMENT") ("The substantive rules applicable to both types of marks are fundamentally identical, however, and the term 'trademark' is generally understood to include marks used in the marketing of either goods or services."); 1 MCCARTHY ON TRADEMARKS § 4:14, at 4–16 ("For all practical purposes, both trademarks and service marks are subject to the same substantive rules of validity and infringement.").

*Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000) (citations, alterations, and quotation marks omitted); *accord* RESTATEMENT § 13, at 104–05 ("A word, name, symbol, device, or other designation . . . is 'distinctive' . . . if: (a) the designation is 'inherently distinctive,' . . . or (b) the designation, although not 'inherently distinctive,' has . . . acquired distinctiveness . . . [,] commonly referred to as 'secondary meaning.'"). Registration of a mark with the PTO constitutes prima facie evidence of the mark's validity and the registrant's exclusive right to use the registered mark in commerce with respect to the specified goods or services. Lanham Act § 7(b) & 33(a), 15 U.S.C. §§ 1057(b) & 1115(a); *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) (citing Lanham Act § 33(a), 15 U.S.C. § 1115(a)).

Amazing Spaces claims that the Star Symbol is sufficiently distinctive to warrant protection as a service mark. The requisite distinctiveness, it claims, is shown in three distinct manners: (1) the statutory presumption of validity flowing from the '845 Registration; (2) the Star Symbol's inherent distinctiveness; and (3) evidence that the Star Symbol has acquired secondary meaning. In response, Metro rejects each claimed source of distinctiveness and further requests that we order cancellation of the '845 Registration. We address each argument in turn.

1.    **Statutory Presumption of Validity**

As mentioned above, proof of the registration of a mark with the PTO constitutes prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the registered mark in commerce with respect to the specified goods or services. Lanham Act §§ 7(b) & 33(a), 15 U.S.C. §§ 1057(b) & 1115(a); *Elvis Presley Enters.*, 141 F.3d at 194 (citing Lanham Act § 33(a), 15

U.S.C. § 1115(a)). This presumption of validity may be rebutted by establishing that the mark is not inherently distinctive. *See Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979) ("Although a statutory presumption of validity is accorded to marks registered under the Lanham Act, this presumption is rebuttable and may be overcome by establishing the generic or descriptive nature of the mark." (citations omitted)); *Xtreme Lashes*, 576 F.3d at 232 (noting that, registration notwithstanding, "if the mark is found to be either generic or descriptive and lacking secondary meaning, a court may cancel it" (citing 15 U.S.C. § 1119; *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir. 1980))). The parties disagree over the effect to be accorded the presumption of validity. According to Amazing Spaces, summary judgment was inappropriate in light of the existence of the presumption. In contrast, Metro's response urges that, "given the ubiquitous use of the Texas Star, the presumption has disappeared entirely from the case."

The Fourth Circuit has, in three cases, addressed the effect of the presumption of validity accorded registered trademarks. In *America Online, Inc. v. AT&T Corp.*, the court was confronted with an argument that it should accord *Chevron* deference[11] to the PTO's decision to register a mark:

> Although we have observed that a district court should not freely substitute its opinion for that of the PTO, this observation was not made because the PTO was entitled to deference, but rather because its decision to register a mark, without requiring evidence of secondary meaning, was powerful *evidence* that the registered

---

[11] The doctrine of *Chevron* deference refers to the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). "Under the familiar *Chevron* framework, we defer to an agency's reasonable interpretation of a statute it is charged with administering." *Cuomo v. Clearing House Ass'n, L.L.C.*, 129 S. Ct. 2710, 2715 (2009) (citing *Chevron*, 467 U.S. 837).

No. 09-20702

mark [was inherently distinctive].

. . . .

The prima facie evidence provided by the certificate of registration was in this case sufficient to establish a question of material fact that could not be resolved on summary judgment. As the Committee Note to Federal Rule of Evidence 301[12] (dealing with presumptions) states, a presumption does not vanish upon the introduction of contradicting evidence . . . ; instead it is merely deemed sufficient evidence of the fact presumed, to be considered by the jury or other finder of fact. Although evidence rebutting the presumption may neutralize the presumption itself—i.e., that the burden of proof on the fact giving rise to the presumption has been met without rebutting evidence—it does not eliminate from the case the evidence itself that gave rise to the presumption. Thus, through the certificate of registration, the Commissioner introduces his opinion that the application of the registrant was sufficient to demonstrate a valid mark.

243 F.3d 812, 817–18 (4th Cir. 2001) (citations, alterations, and quotation marks omitted). The *America Online* court then noted that, in addition to the registration, other evidence tended to create a factual dispute, and it concluded that summary judgment had been improperly granted. *Id.* at 818.

Two later cases addressed whether the *America Online* decision foreclosed summary judgment in any case where the validity of a registered mark was challenged. One case suggested that summary judgment was indeed precluded:

---

[12] Rule 301 provides:

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

FED. R. EVID. 301.

17

"The prima facie evidence provided by the certificate of registration is generally sufficient to establish a question of material fact that cannot be resolved on summary judgment." *U.S. Search, LLC v. U.S. Search.Com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002) (citing *Am. Online*, 243 F.3d at 818). In a later case, the court clarified its approach when confronted with the "argument that [a] certificate of registration alone creates an issue of fact . . . and thereby precludes summary judgment." *Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535, 542 (4th Cir. 2004). The *Retail Services* court discussed the burden-shifting effect of the presumption:

> The presumption of validity flowing from trademark registration . . . has a burden-shifting effect, requiring the party challenging a registered mark to produce sufficient evidence to establish that the mark is [non-distinctive] by a preponderance of evidence. The burden shifted by the presumption is one of production rather than persuasion. If sufficient evidence of [non-distinctiveness] is produced to rebut the presumption, the presumption is "neutralized" and essentially drops from the case, although the evidence giving rise to the presumption remains.

*Id.* at 542–43 (citations and alterations omitted). The court then expressly rejected the contention "that the issuance of a certificate of registration is, by itself, sufficient to create a jury issue on the validity of the mark in question because it embodies the PTO's informed opinion that the mark is registrable," *id.* at 543, and it affirmed the district court's grant of summary judgment in light of the "one-sided evidence . . . rebut[ting] the presumption" in that case, *id.* at 546.

The approach that the Fourth Circuit has taken regarding the presumption of validity is consistent with our precedent. *See Vision Ctr.*, 596 F.2d at 119–20 ("Opticks has argued persuasively, not merely with equal force,

that the partnership's name is [not inherently distinctive].  The weight of these arguments is more than sufficient to rebut the prima facie presumption that the name is [inherently distinctive]." (citations omitted)).  Other circuits are in general agreement.  *See Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783–84 (9th Cir. 2002) ("Under Tie Tech's theory . . . , a defendant in a trademark infringement action could never prevail at the summary judgment stage on an invalidity defense because the registration itself would always raise a material issue of fact.  This approach not only inflates the evidentiary value of a trademark registration, but ignores situations where [validity] can be determined as a matter of law based on undisputed facts."); *Door Sys., Inc. v. Pro–Line Door Sys., Inc.*, 83 F.3d 169, 172 (7th Cir. 1996) ("The presumption of validity . . . evaporates as soon as evidence of invalidity is presented.  Its only function is to incite such evidence, and when the function has been performed the presumption drops out of the case." (citations omitted)); *see also ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 148 (2d Cir. 2007) ("The significance of a presumption . . . is to shift the burden of production to the mark owner to come forward with evidence . . . .  The ultimate burden of persuasion . . . , however, remains at all times with the alleged infringer."); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) ("[A] presumption is not merely rebuttable but completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact.").  As a result, Metro's introduction of evidence that the Star Symbol is not distinctive has reduced the presumption of validity to evidence that the PTO is of the opinion that the Star Symbol is sufficiently distinctive to be legally protectable as a mark.

## 2.    Inherent Distinctiveness

As mentioned above, "a mark is inherently distinctive if 'its intrinsic nature serves to identify a particular source.'" *Wal–Mart Stores*, 529 U.S. at 210 (alteration omitted) (quoting *Two Pesos*, 505 U.S. at 768).    Inherent distinctiveness is attributable to a mark when the mark "almost *automatically* tells a customer that it refers to a brand and . . . immediately signal[s] a brand or a product source."  *Id.* at 212 (alterations and internal quotation marks omitted) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162–63 (1995)).   The parties disagree over not only the answer to whether the Star Symbol is inherently distinctive but also over the proper method for conducting the inquiry.  Metro urges that the familiar *Abercrombie* test cannot be used to categorize the Star Symbol and instead asks that we apply the *Seabrook Foods* test to determine that the Star Symbol is not inherently distinctive.  Amazing Spaces, by contrast, presses the application of the *Abercrombie* test, under which it claims the Star Symbol is inherently distinctive, and it argues alternatively that the Star Symbol is inherently distinctive under the *Seabrook Foods* test.

### a.    Abercrombie

In *Abercrombie*, Judge Friendly sought to arrange the universe of marks into a spectrum of distinctiveness. *See* 537 F.2d at 9. As the Supreme Court has noted, "[m]arks are often classified in categories of generally increasing distinctiveness; following the classific formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos*, 505 U.S. at 768 (citing *Abercrombie*, 537 F.2d at 9); *accord Xtreme Lashes*, 576 F.3d at 227 (noting that "[m]arks are normally assigned" to these categories).  Under this scheme, "'[t]he latter three categories of marks,

because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection,'" *Xtreme Lashes*, 576 F.3d at 227 (quoting *Two Pesos*, 505 U.S. at 768), while "[g]eneric terms receive no trademark protection, [and] descriptive terms merit protection only if they have secondary meaning," *id.* (citing *Two Pesos*, 505 U.S. at 769).

We agree with Metro that the Star Symbol resists categorization under the *Abercrombie* test, and we consequently do not rely on a rote application of its categories in determining whether the Star Symbol is inherently distinctive. The Supreme Court's most recent recitation of the *Abercrombie* categories noted its use only in the context of marks consisting of words. *See Wal–Mart Stores*, 529 U.S. at 210 ("*In the context of word marks*, courts have applied the now-classic test originally formulated by Judge Friendly . . . ." (emphasis added) (citing *Abercrombie*, 537 F.2d at 10–11)). The Court's precedent also supports the proposition that some marks, although deserving of legal protection, do not fit within the *Abercrombie* spectrum. In *Qualitex*, the Court declined to apply the *Abercrombie* test to a mark consisting purely of a shade of color used in a product's trade dress, holding that the mark could constitute a legally protectable mark only through a showing of secondary meaning. 514 U.S. at 162–63. The Court further extended that logic when, in *Wal–Mart Stores*, it stated that "[i]t seems to us that [product] design, like color, is not inherently distinctive" and held that marks consisting of a product's design were protectable only upon proof of secondary meaning—a conclusion it could not have reached had it applied the *Abercrombie* test. *Wal–Mart Stores*, 529 U.S. at 212. Professor McCarthy, a luminary in the field of trademark law, has likewise suggested that the *Abercrombie* test may not apply to all marks, stating that

No. 09-20702

"[u]se of the spectrum of descriptive, suggestive, arbitrary and fanciful is largely confined to word marks. It is usually not suitable for nonword designations such as shapes and images . . . [, which] must be judged by other guidelines." 2 MCCARTHY ON TRADEMARKS § 11:2, at 11–7. The RESTATEMENT, in a section addressed to symbols, graphic designs, and colors, agrees:

> A symbol or graphic design is not inherently distinctive unless the nature of the designation and the manner of its use make it likely that prospective purchasers will perceive the designation as an indication of source. Commonplace symbols and designs are not inherently distinctive since their appearance on numerous products makes it unlikely that consumers will view them as distinctive of the goods or services of a particular seller. Thus, unless the symbol or design is striking, unusual, or otherwise likely to differentiate the products of a particular producer, the designation is not inherently distinctive.

RESTATEMENT § 13 cmt. d, at 107.

As the district court discovered, the challenge of placing the Star Symbol into *Abercrombie*'s constellation of categories is a futile endeavor. We have described the *Abercrombie* categories as follows:

> A *generic* term is the name of a particular genus or class of which an individual article or service is but a member. A generic term connotes the basic nature of articles or services rather than the more individualized characteristics of a particular product. . . . Such terms as aspirin and cellophane have been held generic and therefore unprotectable as trademarks.
>
> A *descriptive* term identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients. . . . Examples of descriptive marks would include Alo with reference to products containing gel of the aloe vera plant and Vision Center in reference to a business offering optical goods and services. . . .
>
> A *suggestive* term suggests, rather than describes, some

22

particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods and services. . . . The term Coppertone has been held suggestive in regard to sun tanning products.

*Arbitrary* or *fanciful* terms bear no relationship to the products or services to which they are applied. . . . The term Kodak is properly classified as a fanciful term for photographic supplies; Ivory is an arbitrary term as applied to soap.

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790–91 (5th Cir. 1983) (citations and quotation marks omitted), *abrogated on other grounds by KB Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004). A mark's placement on this spectrum determines whether and how it is entitled to legal protection. Marks that are suggestive, arbitrary, or fanciful, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos*, 505 U.S. at 768. In contrast, descriptive marks may be protected upon a showing of acquired or secondary meaning, while generic marks may never acquire secondary meaning and are categorically excluded from protection. *Id.* at 768–69.

The district court briefly probed the utility of applying the *Abercrombie* test and concluded that the Star Symbol did not fit as a generic, descriptive, or suggestive mark. *See Amazing Spaces*, 665 F. Supp. 2d at 737. The district court first rejected the notion that the Star Symbol was generic because "[a] five-pointed star within a circle does not refer to a product or service provided by a self-storage company" and "[t]he evidence of widespread use of a five-point star or a five-point star set within a circle by many diverse businesses and government offices supports the conclusion that the star mark is not related to

or a generic symbol for self-storage goods or services." *Id.* It next determined that the Star Symbol was not descriptive because "[i]t does not identify a characteristic or quality of self-storage service, such as its function or quality." *Id.* Nor was the Star Symbol suggestive, according to the district court, because "[t]here is no basis to conclude that a five-pointed star set within a circle suggests an attribute of self-storage services." *Id.* We discern no flaws in the district court's analysis with respect to these three categories. However, the logical extension of the district court's analysis is the conclusion that the Star Symbol is arbitrary or fanciful, which under the *Abercrombie* test would render it inherently distinctive and thus entitled to protection. Yet the district court refused to so conclude, stating that "the star mark cannot be classified as arbitrary or fanciful unless it is inherently distinctive so as to serve as a source identifier for Amazing Spaces." *Id.* It then turned to the *Seabrook Foods* test in conducting its inquiry into the Star Symbol's inherent distinctiveness. *See id.*

We agree that the Star Symbol—indeed, any mark—lacks inherent distinctiveness if its intrinsic nature does not serve to identify its source. *See Wal–Mart Stores*, 529 U.S. at 210 ("[A] mark is inherently distinctive if 'its intrinsic nature serves to identify a particular source.'" (alteration omitted) (quoting *Two Pesos*, 505 U.S. at 768)). Furthermore, as we have already indicated, we approve the district court's decision to apply a test other than *Abercrombie* in this case. However, we disagree somewhat with the district court's reasoning that a mark cannot be categorized as arbitrary or fanciful unless it is inherently distinctive. Under the *Abercrombie* test, it is the categorization of a mark that dictates its inherent distinctiveness, not the other way around. A rote application of the *Abercrombie* test yields the conclusion

No. 09-20702

that the Star Symbol is an arbitrary or fanciful mark because it "'bear[s] no relationship to the products or services to which [it is] applied.'" *Pebble Beach*, 155 F.3d at 540 (quoting *Zatarains*, 698 F.2d at 791).[13]  Were we to apply the *Abercrombie* test mechanically to the Star Symbol, without an eye to the question the test seeks to answer, we would be left with the conclusion that the Star Symbol is inherently distinctive.  The district court, aware of that result, proceeded to apply the *Seabrook Foods* test.  *See Amazing Spaces*, 665 F. Supp. 2d at 737.

Both the Supreme Court and scholars have questioned the applicability of the *Abercrombie* test to marks other than words.  *See Wal–Mart Stores*, 529 U.S. at 210–13 (noting that the *Abercrombie* test was developed and applied "[i]n the context of word marks" and declining to apply it to a mark consisting of product design); *Qualitex*, 514 U.S. at 162–63 (referring to the *Abercrombie* test but not applying it to a mark consisting of a shade of color); RESTATEMENT § 13 cmt. d,

---

[13] One commentator has noted that marks consisting of symbols and designs are typically arbitrary with respect to their associated goods and services where the marks are "nonrepresentational":

> Nonverbal and nonrepresentational designs and figures are perfectly acceptable as trademarks.  Indeed, they have the advantage of being totally arbitrary, and so cannot be descriptive of the goods or services.  The only problem which may be encountered is the question of whether such designs or figures are regarded by the public as identifying indicia or merely as decorations.  Especially is this true of such simple figures as rectangles, diamonds, circles, triangles, or lines.

LOUIS ALTMAN & MALLA POLLACK, 3 CALLMAN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 18:24 (4th ed. 2010) (footnotes omitted).  Under this reasoning, nonverbal marks—even though "arbitrary"—must still be shown to serve as identifying indicia.  Professor McCarthy appears to share the view that such marks are arbitrary when they are nonrepresentational.  *See* 1 MCCARTHY ON TRADEMARKS § 7:36, at 7–91 ("A picture that is merely a representation of the goods themselves is regarded as merely descriptive of the goods.").

at 107 ("[U]nless the symbol or design is striking, unusual, or otherwise likely to differentiate the products of a particular producer, the designation is not inherently distinctive."); 1 MCCARTHY ON TRADEMARKS § 7:33, at 7–88.1–89 ("Ordinary geometric shapes . . . are regarded as nondistinctive and protectable only upon proof of secondary meaning. . . . However, uncommon or unusual shapes and symbols . . . can be regarded as inherently distinctive . . . . The issue is whether this shape is so unusual for this type of goods or services that its distinctiveness can be assumed."); 1 MCCARTHY ON TRADEMARKS § 8:13, at 8–58.1 ("Only in some cases does [*Abercrombie*] classification make sense [for trade dress]. . . . The word spectrum of marks simply does not translate into the world of shapes and images."); 2 MCCARTHY ON TRADEMARKS § 11:2, at 11–7 ("Use of the spectrum of descriptive, suggestive, arbitrary and fanciful is largely confined to word marks. It is usually not suitable for nonword designations such as shapes and images making up trade dress."). We do not go so far as to hold that the *Abercrombie* test is eclipsed every time a mark other than a word is at issue. Instead, we hold that the *Abercrombie* test fails to illuminate the fundamental inquiry in this case: whether the Star Symbol's "'intrinsic nature serves to identify'" Amazing Spaces and its storage services. *Wal–Mart Stores*, 529 U.S. at 210 (quoting *Two Pesos*, 505 U.S. at 768). For the answer to that question, we now turn to the *Seabrook Foods* test employed by the district court.

### b.    Seabrook Foods

In contrast to the *Abercrombie* test, the *Seabrook Foods* test, articulated by the U.S. Court of Customs and Patent Appeals in 1977, applies expressly to marks consisting of symbols and designs:

> In determining whether a design is arbitrary or distinctive this court has looked to [1] whether it was a "common" basic shape

No. 09-20702

> or design, [2] whether it was unique or unusual in a particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [4] whether it was capable of creating a commercial impression distinct from the accompanying words.

*Seabrook Foods*, 568 F.2d at 1344 (footnotes omitted).[14]  The first three of the *Seabrook Foods* "'questions are merely different ways to ask whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 40 (1st Cir. 1998) (quoting 1 MCCARTHY ON TRADEMARKS § 8:13, at 8–58.5).[15]  As is true of the *Abercrombie* test, the *Seabrook Foods* test seeks an answer to the question whether a mark's "'intrinsic nature serves to identify a particular source.'" *Wal–Mart Stores*, 529 U.S. at 210 (quoting *Two Pesos*, 505 U.S. at 768); *accord* 1 MCCARTHY ON TRADEMARKS § 3:3,

---

[14] As noted above, the district court omitted discussion of the fourth factor, which by its terms applies only when a party seeks trademark protection for a background design typically accompanied by words. *See Amazing Spaces*, 665 F. Supp. 2d at 736.  Similarly, we will not consider the fourth *Seabrook Foods* factor.

[15] The Second Circuit has also used a related test that asks "whether [the mark] is 'likely to serve primarily as a designator of origin of the product.'" *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1008 (2d Cir. 1995) (quoting *Duraco Prods., Inc. v. Joy Plastic Enters.*, 40 F.3d 1431, 1449 (3d Cir. 1994)).  Although the *Knitwaves* court quoted the *Duraco Products* court for part of its test, it rejected the requirements that the product configuration "be 'unusual and memorable' and 'conceptually separable from the product.'"  *Id.* at 1009 n.6 (quoting *Duraco Prods.*, 40 F.3d at 1449); *see also Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 787–88 (8th Cir. 1995) (rejecting the *Duraco Products* test as inconsistent with *Two Pesos* by imposing additional, non-statutory requirements).  The First Circuit has, in turn, criticized the *Knitwaves* test as inconsistent with *Two Pesos* because it fails to keep the inherent distinctiveness inquiry separate from the secondary meaning inquiry.  *See I.P. Lund Trading*, 163 F.3d at 41.  This case does not require us to delve into the propriety of these variations on the *Seabrook Foods* test, and we do not do so.

at 3–6 ("[A] designation must be proven to perform the job of identification: to identify one source and distinguish it from other sources. If it does not do this, then it is not protectable as a trademark, service mark, trade dress or any similar exclusive right.").[16]

We agree with the assessment of the *I.P. Lund Trading* court and Professor McCarthy that the *Seabrook Foods* factors are variations on a theme rather than discrete inquiries. In *Star Industries v. Bacardi & Co.*, the Second Circuit noted that "'[c]ommon basic shapes' or letters are, as a matter of law, not inherently distinctive . . . , [but] stylized shapes or letters may qualify, provided the design is not commonplace but rather unique or unusual in the relevant market." 412 F.3d 373, 382 (2d Cir. 2005) (citing *Seabrook Foods*, 568 F.2d at 1344; *Permatex Co. v. Cal. Tube Prods., Inc.*, 175 U.S.P.Q. 764, 766 (T.T.A.B. 1972)). This statement, turning on whether the symbol or design is "common," comprises, essentially, the first two *Seabrook Foods* factors. However, the third *Seabrook Foods* factor similarly asks whether a symbol or design is "common" in the sense that it is likely to be perceived by the public as ornamentation rather than a mark. *See Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 142 (1st Cir. 1985) (equating a red heart shape on a teddy bear to "an ordinary geometric shape" because it "carrie[d] no distinctive message of origin to the consumer, . . .

---

[16] We note, of course, that the *Wal–Mart* Court was urged by the respondent in that case and by the United States as *amicus curiae* to adopt the *Seabrook Foods* test writ large for product design but declined to do so. *Id.* at 213–14. The Court's concern was that "[s]uch a test would rarely provide the basis for summary disposition of an anticompetitive strike suit." *Id.* at 214. However, as discussed below, we are of the opinion that the relevant portions of the *Seabrook Foods* test do provide a basis for summary disposition in this case. Because we conclude that the Star Symbol is not inherently distinctive under the *Seabrook Foods* test, we do not address whether it constitutes a "reasonably clear test," *id.* at 213, such that it would be preferable to the *Abercrombie* test in the ordinary trademark or service mark dispute.

given the heart shape's widespread use as decoration for any number of products put out by many different companies").[17] A "common" symbol or design—lacking inherent distinctiveness—is the antithesis of a symbol or design that "'is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark.'" *I.P. Lund Trading*, 163 F.3d at 40 (quoting 1 MCCARTHY ON TRADEMARKS § 8:13, at 8–58.5); *accord* RESTATEMENT § 13 cmt. d, at 107 ("Commonplace symbols and designs are not inherently distinctive since their appearance on numerous products makes it unlikely that consumers will view them as distinctive of the goods or services of a particular seller.").

The district court determined that the Star Symbol was "not a plain five-pointed star" but was instead "shaded and set within a circle," rendering it "sufficient[ly] styliz[ed]" to be "more than a common geometric shape." *Amazing Spaces*, 665 F. Supp. 2d at 737. It then proceeded to conclude that the Star Symbol "[wa]s not inherently distinctive and d[id] not act as an indicator of origin for any self-storage business, including Amazing Spaces." *Id*. at 738. It supported this assertion with a discussion of "[t]he ubiquitous nature of the five-

---

[17] The interrelationship between these inquiries is also reflected in Professor McCarthy's discussion of common geometric shapes:

> Most common geometric shapes are regarded as not being inherently distinctive, in view of the common use of such shapes in all areas of advertising. Thus, such ordinary shapes as circles, ovals, squares, etc., either when used alone or as a background for a word mark, cannot function as a separate mark unless (1) the shape is likely to create a commercial impression on the buyer separate from the word mark or any other indicia and (2) the shape is proven to have secondary meaning . . . . The rationale is that such designs have been so widely and commonly used as mere decorative graphic elements that the origin-indicating ability of such designs has been diminished.

1 MCCARTHY ON TRADEMARKS § 7:29, at 7–73–74 (footnotes omitted).

pointed star set within a circle" in Texas, specifically its "use[] as a decoration or ornamentation on innumerable buildings, signs, roads, and products." *Id.* The court concluded that this ubiquity—including use of the same or a similar star design in 63 industries businesses and 28 other self-storage locations—"preclude[d] a finding that [the Star Symbol wa]s inherently distinctive or that it c[ould] serve as an indicator of origin for a particular business." *Id.*

Undoubtedly, the Star Symbol is stylized relative to an unshaded five-pointed star design not set within a circle. However, we disagree that the issue of stylization revolves around comparing a design's actual appearance to its corresponding platonic form. Instead, as discussed above, asking whether a shape is stylized is merely another way of asking whether the design is "commonplace" or "unique or unusual in the relevant market," *Star Indus.*, 412 F.3d at 382 (citing *Permatex*, 175 U.S.P.Q. at 766), or whether it is "a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation," *Seabrook Foods*, 568 F.2d at 1344.[18]   The stylization inquiry is properly

---

[18] The parties dispute the scope of the "relevant market"—specifically, whether the district court correctly considered use of a similar or identical star design beyond the self-storage service industry. Amazing Spaces contends that we should limit our analysis to the self-storage services industry, while Metro argues that we may take into account uses of star designs in a larger context. The second *Seabrook Foods* factor refers to uniqueness or unusualness "in a particular field," 568 F.2d at 1344, and the Second Circuit has stated that a stylized design may be protectable when it "is not commonplace but rather unique or unusual in the relevant market," *Star Indus.*, 412 F.3d at 382. Similarly, the third factor refers to whether a mark is commonly used as ornamentation for a "particular class of goods." *Seabrook Foods*, 568 F.2d at 1344. In contrast, the First Circuit, in considering whether a red heart on the chest of a teddy bear was inherently distinctive, appeared to consider the broader use of red hearts in determining whether the use at issue was unique or unusual. *See Wiley*, 762 F.2d at 142 ("[T]he record contains so many examples of use of a red heart motif on teddy

No. 09-20702

conceived of asking whether a particular symbol or design is stylized such that prospective purchasers of goods or services are likely to differentiate it from other, similar symbols or designs.[19] *See Wiley*, 762 F.2d at 142 (holding that a red heart on a teddy bear "carrie[d] no distinctive message of origin to the consumer . . . given the heart shape's widespread use as decoration for any number of products put out by many different companies"); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir. 1983) (holding that a design

---

bears and other stuffed animals, *not to mention all manner of other toys and paraphernalia*, that no reasonable argument on this point can be made." (emphasis added)). The rule in the RESTATEMENT asks whether, "because of the nature of the designation and *the context in which it is used*, prospective purchasers are likely to perceive it as a designation that . . . identifies goods or services produced or sponsored by a particular person." RESTATEMENT § 13(a), at 104 (emphasis added). It further explains that

> [c]ommonplace symbols and designs are not inherently distinctive since their appearance on numerous products makes it unlikely that consumers will view them as distinctive of the goods or services of a particular seller. Thus, unless the symbol or design is striking, unusual, or otherwise likely to differentiate the products of a particular producer, the designation is not inherently distinctive.

*Id.* § 13 cmt. d, at 107. Finally, and most importantly, the Lanham Act defines "service mark" as a mark used "to identify and distinguish the services of one person . . . from the services of others and to indicate the source of the services." Lanham Act § 45, 15 U.S.C. § 1127. Because a mark must distinguish one person's services from another, we agree that our inquiry is whether the Star Symbol identifies and distinguishes Amazing Spaces's self-storage services from others' self-storage services. This does not mean, however, that we must blind ourselves to uses beyond the self-storage services industry: the fact that the same or a similar star is used in countless other ways certainly bears on whether it is "likely that prospective purchasers will perceive [a given star design] as an indication of source" within a particular industry because a "[c]ommonplace symbol[']s . . . appearance on numerous products makes it unlikely that consumers will view [it] as distinctive of the goods or services of a particular seller." RESTATEMENT § 13 cmt. d, at 107.

[19] Under this analysis, use by third parties of a design bears on whether the design is inherently distinctive, not merely whether the design "is a 'strong' or a 'weak' []mark." *Exxon Corp. v. Tex. Motor Exchange of Houston, Inc.*, 628 F.2d 500, 504 (5th Cir. 1980); *cf. Union Nat'l Bank of Tex., Laredo, Tex.*, 909 F.2d at 848 n.25 (noting that widespread industry use can render a mark not inherently distinctive, but third-party use otherwise typically affects the issue of whether there is a likelihood of confusion between marks).

31

consisting of a "V," "7," or arrow on athletic shoes was common ornamentation such that it was not inherently distinctive); RESTATEMENT § 13 cmt. d, at 107 ("The manner in which a symbol or design is used is also relevant to the likelihood that it will be perceived as an indication of source. In some instances a design is likely to be viewed as mere ornamentation rather than as a symbol of identification."); 1 MCCARTHY ON TRADEMARKS § 3.3, at 3–11 ("Usually, if when viewed in context, it is not immediately obvious that a certain designation is being used as an indication of origin, then it probably is not. In that case, it is not a trademark."). The record evidence is replete with similar or identical five-pointed stars, both raised and set in circles, and used in similar manners, such that—notwithstanding the residual evidence of the presumption of validity—no reasonable jury could find that the Star Symbol is even a mere refinement of this commonly adopted and well-known form of ornamentation.[20] The Star Symbol is thus not "'so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark,'" *I.P. Lund Trading*, 163 F.3d at 40 (quoting 1 MCCARTHY ON TRADEMARKS § 8:13, at 8–58.5), and it "does not

---

[20] This is what differentiates the Star Symbol from the examples of registered marks containing stars that Amazing Spaces cites to support the protectability of five-pointed stars. The Dallas Cowboys star is stylized through the inclusion of a white border. The star in the Wal–Mart registration is a plain, five-pointed star, but the registered mark consists of more than just the star—the mark is the words "Wal" and "Mart" on either side of the star. The LanChile Airlines star is set against a circle that is 50% filled in, and it is adjacent to the words "LanChile Airlines." Finally, the USA Truck mark is a complex design consisting of a white star within a blue circle, set against a white rectangle with blue borders and a red stripe running across the middle. Each of these marks contains elements distinguishing it from the commonplace stars in the record. *See Union Nat'l Bank of Tex., Laredo, Tex.*, 909 F.2d at 848 n.25 (noting that the appropriate inquiry is whether the mark as a whole is protectable, not whether its component parts are individually protectable (citing *Estate of P.D. Beckwith v. Comm'r of Patents*, 252 U.S. 538 (1919))).

No. 09-20702

almost *automatically* tell a customer that it refers to a brand . . . [or] immediately signal a brand or a product source," *Wal–Mart Stores*, 529 U.S. at 212 (alterations and internal quotation marks omitted).  Because the Star Symbol does not, by "'its intrinsic nature[,] serve[] to identify a particular source," *id.* at 210, it is not inherently distinctive, and it can be protected only upon a showing of secondary meaning.

### 3.    Secondary Meaning

The parties disagree over whether the Star Symbol has acquired distinctiveness through secondary meaning.  "Secondary meaning occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself."  *Smack Apparel*, 550 F.3d at 476 (alteration and internal quotation marks omitted) (quoting *Wal–Mart Stores*, 529 U.S. at 211).[21]

> Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source.  To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.

*Two Pesos*, 505 U.S. at 766 n.4 (citations and quotation marks omitted); *accord Smack Apparel*, 550 F.3d at 476 ("A mark has acquired secondary meaning when it 'has come through use to be uniquely associated with a specific source.'" (quoting *Pebble Beach*, 155 F.3d at 536)).  "The inquiry is one of the public's

---

[21] The *Wal–Mart Stores* Court noted that the term "secondary meaning" "is often a misnomer in th[e] context [of nonword marks], since nonword marks ordinarily have no 'primary' meaning."  529 U.S. at 211 n.*.  The Court suggested that a clearer description of the concept would use the term "acquired meaning," but the Court followed "the conventional terminology" of "secondary meaning."  *Id.*  We follow it as well.

No. 09-20702

mental association between the mark and the alleged mark holder." *Smack Apparel*, 550 F.3d at 476 (citing *Sno–Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 427 (5th Cir. 1986)). "Because the primary element of secondary meaning is a mental association in buyer[s'] minds between the alleged mark and a single source of the product, the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry." *Sunbeam Prods.*, 123 F.3d at 253 (emphasis and internal quotation marks omitted) (quoting *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 n.4 (5th Cir. 1984), *abrogated on other grounds by TrafFix Devices*, 532 U.S. 23).

In the context of trade dress, we have articulated seven factors to consider in determining whether secondary meaning has been shown:

> "(1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress."

*Smack Apparel*, 550 F.3d at 476 (quoting *Pebble Beach*, 155 F.3d at 541).[22] "In considering this evidence, the focus is on how it demonstrates that the meaning of the mark or trade dress has been altered in the minds of consumers." *Pebble Beach*, 155 F.3d at 541 (citing *Zatarains*, 698 F.2d at 795); *accord Zatarains*, 698 F.2d at 795 ("'[T]he question is not the *extent* of promotional efforts, but their *effectiveness* in altering the meaning of the term to the consuming public.'" (alteration omitted) (quoting *Aloe Creme Labs., Inc. v. Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir. 1970))). We have consistently expressed a preference for "an

---

[22] We recognize that these factors may apply with varying force depending on whether the mark is a service mark or whether it consists of a symbol or design.

objective survey of the public's perception of" the mark at issue. *Vision Ctr.*, 596 F.2d at 119; *accord Sno–Wizard Mfg.*, 791 F.2d at 427 ("'The authorities are in agreement that survey evidence is the most direct and persuasive way of establishing secondary meaning.'" (quoting *Zatarains*, 698 F.2d at 795)).

The district court considered the following evidence that Amazing Spaces claimed raise a fact issue regarding secondary meaning: (1) the Star Symbol was used for ten years; (2) Amazing Spaces had spent nearly $725,000 in advertising and promoting the Star Symbol; (3) Amazing Spaces had realized over $11.5 million in revenue since it first began using the Star Symbol; (4) Kathy Tautenhahn's statement in her declaration that the Star Symbol identifies Amazing Spaces's self-storage services; and (5) declarations of a customer and an alarm technician about confusion when seeing rival self-storage facilities (Metro and Community) that displayed symbols similar to the Star Symbol. *See Amazing Spaces*, 665 F. Supp. 2d at 740. The district court concluded that no fact issue was raised. *Id.* at 742. It based this conclusion partly on the absence of survey evidence, *id.* at 741–42, but primarily on its determination that the remaining evidence was not probative regarding secondary meaning: the advertisements did not prominently display the Star Symbol but instead prominently featured the Peaks and Sky Symbol, and the declarations described confusion only in reference to the overall architecture of the facilities, *id.* at 742.

We agree with the district court that no fact issue has been raised regarding the existence of secondary meaning. As we discussed above, Amazing Spaces's use of the Star Symbol has been primarily decorative and ornamental. Moreover, the record discloses that the Star Symbol was almost invariably used not as a stand-alone mark but was rather, as Amazing Spaces states in its brief,

"an integral part of several marks that Amazing Spaces uses—indeed it is the one common element across its non-word marks." While this argument might support secondary meaning as to those other marks, it does not support secondary meaning as to the Star Symbol. *Cf. Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1120 (5th Cir. 1991) ("[C]ompetitors may use individual elements in Taco Cabana's trade dress, but the law protects the distinctive totality."), *aff'd*, 505 U.S. 763. This logic extends to the advertising present in the record. While the Star Symbol (or a variation thereof) constitutes a minor piece of the Peaks and Sky Symbol, marks Amazing Spaces's locations on a map, or replaces the bullet in a bulleted list, it is virtually absent as a stand-alone mark from Amazing Spaces's advertising in the record. This predominant advertising use belies the force Amazing Spaces would attribute to its telephonic advertising directing customers to "look for the star." Nor does Amazing Spaces's volume of sales—to the extent that it applies to a service mark rather than a trademark, trade dress, or product design—reveal secondary meaning: the advertising attempted to attract customers using marks other than the Star Symbol.

We also agree with the district court's assessment that the two declarations evidencing consumer confusion do not bear on the secondary meaning of the Star Symbol. Shane Flores averred that he was confused by the appearance of a Metro facility's "use of a star logo in conjunction with the similarity in the architectural features and designs" and believed it to be an Amazing Spaces facility. Glen Gilmore averred similarly with respect to a Community facility. While these instances of confusion may bear on Amazing

Spaces's trade dress claims,[23] they do not have relevance as to the secondary meaning of the Star Symbol itself.[24]   Amazing Spaces also claims that intentional copying has been shown because Metro constructed a facility that incorporated a star design after this lawsuit had been filed.  But this chronology does not bear on whether Metro's use of a common design was intentional copying of Amazing Spaces's design.  Amazing Spaces also contends that the district court placed undue emphasis on the lack of a survey.  We have already noted this court's preference for survey evidence as proof of secondary meaning, and we also note that the other factors do not weigh in Amazing Spaces's favor.  As Professor McCarthy has stated, "in a borderline case where it is not at all obvious that [a] designation has been used as a mark, survey evidence may be necessary to prove trademark perception."  1 MCCARTHY ON TRADEMARKS § 3.3, at 3–8.

In conclusion, we agree with the district court's assessment that Amazing Spaces has failed to raise a fact issue regarding the existence of secondary meaning with respect to the Star Symbol.  In light of the overwhelming evidence that the Star Symbol is not distinctive, we hold that it does not serve "to identify and distinguish the services of" Amazing Spaces.  Lanham Act § 45, 15 U.S.C. § 1127.

### 4.    Cancellation of the '845 Registration

At the conclusion of its brief, Metro argues that because the Star Symbol

---

[23] We discuss Amazing Spaces trade dress claims below, but we express no opinion on the weight the declarations should be accorded in resolving those claims.

[24] This is also true with respect to Kathy Tautenhahn's declaration, in which she averred that managers had reported inquiries about whether Amazing Spaces had facilities where Metro facilities were located.

"is incapable of serving as a trademark," we should "cancel the registration pursuant to 15 U.S.C. § 1119." Section 37 of the Lanham Act provides that "[i]n any action involving a registered mark the court may . . . order the cancelation of registrations, in whole or in part . . . ." Lanham Act § 37, 15 U.S.C. § 1119; *accord Xtreme Lashes*, 576 F.3d at 232. We may not, however, order cancellation of the Star Symbol in this appeal. "[T]his circuit follows the general rule that, in the absence of a cross-appeal, an appellate court has no jurisdiction to modify a judgment so as to enlarge the rights of the appellee or diminish the rights of the appellant." *Borrego Springs Bank, N.A. v. Skuna River Lumber, L.L.C.* (*In re Skuna River Lumber, L.L.C.*), 564 F.3d 353, 356 (5th Cir. 2009) (citing *Morley Constr. Co. v. Md. Cas. Co.*, 300 U.S. 185 (1937); *Kelly v. Foti*, 77 F.3d 819, 822 (5th Cir. 1996)). The district court's judgment dismissed Amazing Spaces's claim that Metro was infringing its trademark rights in the Star Symbol, and it denied as moot all of Metro's affirmative defenses and counterclaims—including a request that the Star Symbol's registration be cancelled. *See Amazing Spaces*, 665 F. Supp. 2d at 742. We are dubitante that the district court's grant of summary judgment rendered the cancellation issue moot, but because Metro has not cross-appealed that judgment, we are without jurisdiction to award it further relief by ordering the '845 Registration canceled. However, as discussed below, we conclude that the district court erred in dismissing Amazing Spaces's remaining claims with prejudice, and we must remand for further proceedings. The district court is, of course, free to consider Metro's cancellation request on remand.

## B.    Trade Dress Claims

Having concluded that the district court correctly held that the Star

Symbol is not protectable as a mark, we next address whether the district court correctly dismissed Amazing Spaces's causes of action relating to its trade dress and facility design.  Amazing Spaces asserts that the following causes of action were improperly dismissed because they do not "rest entirely on whether the Star Logo is entitled to trademark protection": (1) trade dress infringement under the Lanham Act and Texas common law; (2) copyright infringement; and (3) trade dress dilution in violation of the Texas anti-dilution statute.

We "may affirm a grant of summary judgment on any appropriate ground that was raised to the district court and upon which both parties had the opportunity to introduce evidence." *Conkling*, 18 F.3d at 1296 n.9 (citing cases). However, these other claims were not yet before the district court, and Amazing Spaces had not yet had the opportunity to introduce evidence relating to those claims. We therefore reverse the district court's judgment insofar as it dismissed those claims, and we remand for further proceedings.  We briefly explain our decision as to each claim.

### 1.    Trade Dress Infringement

In addition to its claim that Metro had infringed its Star Symbol service mark, Amazing Spaces also brought claims for trade dress infringement under § 43(a) of the Lanham Act and Texas common law. *See Blue Bell Bio–Med. v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989) ("The Lanham Act creates a cause of action for trade dress infringement.  This action is analogous to the common law tort of unfair competition." (citing cases)).  "Trade dress refers to the total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Pebble Beach*, 155 F.3d

at 536 (internal quotation marks omitted) (quoting *Sunbeam Prods.*, 123 F.3d at 251 & n.3); *accord* RESTATEMENT § 16, at 156 ("The design of elements that constitute the appearance or images of goods or services as presented to prospective purchasers, including . . . displays [and] decor, . . . is eligible for protection as a mark . . . ."). Trade dress protection has been extended to the overall "motif" of a restaurant, *Two Pesos*, 505 U.S. at 765, and to the layout of golf holes, *Pebble Beach*, 155 F.3d at 537. "The purpose of trade dress protection, like trademark protection, is to 'secure the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing products.'" *Eppendorf–Netheler–Hinz GmbH v. Ritter GmbH*, 289 F.3d 351, 355 (5th Cir. 2002) (alteration omitted) (quoting *Two Pesos*, 505 U.S. at 774).

Amazing Spaces is correct that, to protect the overall appearance of its facilities as trade dress, it need not establish that the Star Symbol is legally protectable. Amazing Spaces's claimed trade dress, unlike the Star Symbol, consists of the entirety of the facilities' design, including placement of the Star Symbol under the roof peaks. *See Taco Cabana Int'l*, 932 F.2d at 1120 ("[T]he existence of [non-distinctive] elements does not eliminate the possibility of inherent distinctiveness in the trade dress as a whole."). The district court limited discovery to the issue of the trademarkability of the Star Symbol, and Amazing Spaces was therefore unable to present its trade dress and unfair competition claims. We therefore reverse the dismissal of those claims and remand for further proceedings.

### 2.    Copyright Infringement

In its complaint, Amazing Spaces also alleged infringement of its

No. 09-20702

"copyrights in and to the architectural and design features of Amazing Spaces'[s] storage facilities by its promotion, development, construction of storage facilities substantially similar to those of Amazing Spaces and by preparing derivative works of Amazing Spaces['s] copyrighted architectural works." "To establish a claim for copyright infringement, a plaintiff must prove that: (1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original." *Positive Black Talk Inc. v. Cash Money Records Inc.*, 394 F.3d 357, 367 (5th Cir. 2004) (citing *Gen. Universal Sys. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) (per curiam); *Szabo v. Errisson*, 68 F.3d 940, 942 (5th Cir. 1995)), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010). To demonstrate the second element—copying—"a plaintiff must prove: (1) factual copying and (2) substantial similarity." *Id.* (citing *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003)). None of these elements is disposed of in this case by a determination that the Star Symbol is not a valid mark. The district court did not permit discovery regarding Amazing Spaces's copyright claim, and its opinion does not address whether copyright infringement occurred. We therefore reverse and remand on this claim as well.

### 3.    Trade Dress Dilution

Texas provides a statutory cause of action for dilution of protectable marks:

> A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services. . . .

TEX. BUS. & COM. CODE ANN. § 16.29. Amazing Spaces alleged that Metro's

actions had the effect of "dilut[ing] and blur[ring] the distinctiveness of Amazing Spaces'[s] distinctive service mark and trade dress and the goodwill associated therewith." While our discussion above disposes of the claim of service mark dilution, Amazing Spaces's trade dress dilution claim has not yet been addressed by the district court. We therefore reverse and remand on that aspect of Amazing Spaces's dilution cause of action as well.

## IV. CONCLUSION

The Star Symbol is not inherently distinctive, and Amazing Spaces has not raised a genuine issue of material fact regarding secondary meaning. The Star Symbol is thus not legally protectable as a mark, and we accordingly AFFIRM the district court's judgment dismissing Amazing Spaces's claim for service mark infringement. However, whether the Star Symbol is legally protectable as a mark is not dispositive of Amazing Spaces's remaining federal claims for trade dress and copyright infringement or its state claims for common law trade dress infringement and statutory trade dress dilution. We therefore REVERSE the district court's judgment insofar as it dismissed those claims, and we REMAND for further proceedings. On remand, the district court is free to consider Metro's arguments relating to cancellation of the Star Symbol's registration in the first instance.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED. Each party shall bear its own costs.

No. 09-20702

**APPENDIX**

Int. Cl.: 39

Prior U.S. Cls.: 100 and 105

**United States Patent and Trademark Office**

Reg. No. 2,859,845
Registered July 6, 2004

**SERVICE MARK**
**PRINCIPAL REGISTER**



AMAZING SPACES (TEXAS CORPORATION)
9040 LOUETTA ROAD, SUITE B
SPRING, TX 77379

FOR: STORAGE SERVICES, IN CLASS 39 (U.S. CLS. 100 AND 105).

FIRST USE 4-0-1998; IN COMMERCE 4-0-1998.

SER. NO. 76-540,854, FILED 8-15-2003.

DOMINIC J. FERRAIUOLO, EXAMINING ATTORNEY