# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 12, 2022

Lyle W. Cayce
Clerk

No. 21-30029

Beatriz Ball, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Barbagallo Company, L.L.C., doing business as Pampa Bay,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-10214

Before Jones, Haynes, and Costa, *Circuit Judges*.

Per Curiam:

Beatriz Ball, a maker of popular tableware designs, challenges the district court's conclusions that (1) the company lacked standing under the Copyright Act because the plaintiff did not obtain a valid assignment of its claim, and (2) it failed to establish a protectible trade dress under the Lanham Act. We hold that the district court erred in its standing determination and that certain errors in its analysis of the trade dress claim require

No. 21-30029

reconsideration by the district court. Accordingly, we REVERSE and REMAND the judgment.[1]

## BACKGROUND

Beatriz Ball, LLC, is a Louisiana company doing business as Beatriz Ball and Beatriz Ball Collection. Beatriz Ball, the individual, ("Ms. Ball") is the company's owner, founder, and designer.[2] Barbagallo Company, LLC is a New Jersey company doing business as Pampa Bay. Beatriz Ball alleges that Pampa Bay has been marketing and distributing products that infringe on Beatriz Ball's registered copyrights and its unregistered trade dress for its "Organic Pearl" line of tableware. Beatriz Ball brought suit against Pampa Bay in Louisiana federal court, asserting claims for copyright infringement under the Copyright Act and unfair competition under § 43 of the Lanham Act.

### I.    Beatriz Ball and the Organic Pearl Collection

Beatriz Ball as it currently exists is the result of the ingenuity of a woman who, as a child, fled penniless with her family from communism in Cuba to Mexico with hope for a better life. In Mexico, Ms. Ball befriended a family that owned a successful business creating silver designs out of a new cheaper alloy. The process and concept intrigued her, and she remained close to the family, learned the trade, and observed the growth of their business over the years.

Ms. Ball later married and moved to New Orleans, where she started her own small business buying alternative metal pieces from small foundries and selling them at home shows and bazaars. When her endeavors met with

---

[1] Judge Haynes concurs in the judgment only.

[2] Ms. Ball is not a party to this suit.

success, she decided that she wanted to control production of her products, so she built her own factory and hired artisans. She began designing her own pieces, and she developed a unique alloy combination with particular elements that enhanced the shine so that it looked "as much [like] silver as possible." This new control enabled her to expand from direct consumer sales to business-to-business sales because she could guarantee the quality and quantity of production.

Today, Beatriz Ball has grown into a very successful company. It presently has 13 active collections with products made from a variety of materials, with metalware remaining the bulk of its sales. At issue in the present dispute is the company's Organic Pearl collection, which has been on the market since 2005. It remains one of the company's most popular collections. A main feature of this collection is its pearl border, consisting of handcrafted pearls varying in size and shape, intending to appear unpredictable and distorted. In addition to the "organic shape and . . . free-formed pearl," the collection also incorporates a more reflective design. The disuniformity in both the pearl border and in the overall shape is one of the defining characteristics of the Organic Pearl collection. Each piece is individually produced by hand in Mexico using an ancient sand-mold casting method that requires a rare set of skills.

Beatriz Ball has registered copyrights protecting four of its Organic Pearl designs. It also claims that its Organic Pearl line embodies a distinct trade dress, which is protectible under the Lanham Act. Beatriz Ball identifies its trade dress in the "Organic Pearl" collection as follows:

> [Beatriz Ball] owns trademark rights to the "look and feel" — i.e., the trade dress—of the "Organic Pearl" collection . . . . The Organic Pearl trademark applies to tableware of hand-crafted and artisanal quality, such that each item in the collection will have individual variation because

each is poured and polished by hand with each piece having undulating shape ornamented with rims of individually-formed clay bead, each intentionally having a slightly irregular shape and size accentuating their hand-made artisanal quality.

Importantly, Organic Pearl is not a registered trade dress.

## II. Pampa Bay

Since 2016, Pampa Bay has been marketing and distributing products that look strikingly similar to the Organic Pearl designs. While nearly identical in appearance to many pieces of Organic Pearl tableware, Pampa Bay products are made with cheaper materials and are sold at lower priced retail outlets. Because of this, Beatriz Ball alleges that Pampa Bay has infringed upon its copyright and its unregistered trade dress. It claims that Pampa Bay's product lines are "confusingly similar" to Beatriz Ball's unique Organic Pearl collection because "Pampa Bay's products copy the 'look and feel' of Beatriz Ball Organic Pearl trade dress in every attribute." In the images reproduced below, Beatriz Ball's products appear on the left and Pampa Bay's products appear on the right.




No. 21-30029

### III.     District Court Proceedings

The district court conducted a three-day bench trial and ultimately ruled against Beatriz Ball on all of its claims.  Regarding the Lanham Act claims, Judge Vitter found that Beatriz Ball had not met its burden of establishing that its unregistered trade dress acquired "secondary meaning." Since secondary meaning is a prerequisite for protection of an unregistered trade dress under the Lanham Act, the district court found for Pampa Bay without reaching the merits of Beatriz Ball's claim.

Further, the district court held that Beatriz Ball lacked standing to bring the copyright claims because it lacked a legal interest in causes of action for the relevant infringements.  All four copyrights list "Beatriz Ball Collection" as the copyright claimant.  The day before this lawsuit was filed, Beatriz Ball Collection assigned ownership of these copyrights to plaintiff Beatriz Ball, LLC.  The language of the assignment is as follows:

> **Assignment**.  Assignor [Beatriz Ball and Beatriz Ball Collection] hereby irrevocably conveys, transfers, and assigns to Assignee [Beatriz Ball, LLC], and Assignee hereby accepts, all of Assignor's right, title and interest in and to any and all copyrights, whether registered or not and whether or not applications have been filed with the United States Copyright Office or any other governmental body. This assignment expressly includes any and all rights associated with those copyrights.

The district court judge based her decision solely on the language of this assignment.  She found that, because the assignment did not specifically transfer the Assignor's right to causes of action for prior infringements, plaintiff Beatriz Ball, LLC lacked standing to challenge infringements pre-dating the assignment.  Beneficial ownership of a copyright is a precondition

5

No. 21-30029

to standing.[3]  Consequently, the district court did not reach the merits of the copyright claim.  Beatriz Ball timely appealed the take-nothing judgment as to the Copyright Act and Lanham Act claims.

## STANDARD OF REVIEW

The district court's determination on standing is reviewed *de novo*. *Three Expo Events, L.L.C. v. City of Dallas, Texas*, 907 F.3d 333, 340 (5th Cir. 2018).  Following a bench trial, this court reviews findings of fact for clear error and legal issues *de novo*.  *Preston Expl. Co., L.P. v. GSF, L.L.C.*, 669 F.3d 518, 522 (5th Cir. 2012).

## DISCUSSION

### I.    Standing to Bring Copyright Claims

The Copyright Act provides a cause of action to "[t]he legal or beneficial owner" of a copyright to vindicate infringements. 17 U.S.C. § 501(b).  To prevail on a copyright infringement claim, a plaintiff must show ownership of a valid copyright; factual copying; and substantial similarity. *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 544 (5th Cir. 2015).  Thus, the question regarding standing is simple—if Appellant owned the copyrights at the time of the alleged infringements *or* if Appellant was effectively assigned the rights to vindicate prior infringements, it has standing to proceed.

The issue of plaintiff's standing to sue was not raised by Pampa Bay until closing argument in the trial.  Responding to the last-minute argument, the district court had no factual record on standing but interpreted the assignment from Beatriz Ball Collection as legally insufficient to confer standing.  We are inclined to disagree with the court's conclusion.  In any

---

[3] 17 U.S.C. § 501(b).

event, there is a more straightforward path to finding that Appellant indeed had standing through the Copyright Act's safe harbor for innocent errors on copyright registrations.

On appeal, Beatriz Ball contends, without dispute, that "Beatriz Ball, LLC" and "Beatriz Ball Collection" are the same entity, and the assignment was executed just before suit was filed out of an abundance of caution in the (vain) hope of eliminating any confusion. We hold, however, that the original filing was sufficient. The Copyright Act provides that a registration with "inaccurate information" can support an infringement action if the misstatements in the application were either (1) unknowing or (2) immaterial. 17 U.S.C. § 411(b)(1);[4] *see One Treasure, Ltd., Inc. v. Richardson,* 202 F.App'x 658, 660 (5th Cir. 2006) (unpublished) (per curiam); 2 MELVILLE NIMMER, NIMMER ON COPYRIGHT § 7:20 (2021).

The mistakes on Beatriz Ball's copyright registrations are quintessential examples of the unknowing errors § 411(b)(1) is meant to excuse. Nonlawyer employees mistakenly listed the company's trade name—instead of its proper corporate designation, Beatriz Ball, LLC—on the copyright applications. Everything in the record suggests that this was an innocent, inadvertent error made by workers unfamiliar with the legalese and

---

[4] This provision states:

(b)(1) A certificate of registration satisfies the requirements of this section and section 412, regardless of whether the certificate contains any inaccurate information, unless—

(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and

(B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1).

misled by inconsistent instructions from the Copyright Office. The Supreme Court explained earlier this year that "[l]ack of knowledge of either fact or law can excuse an inaccuracy in a copyright registration." *Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, 142 S. Ct. 941, 945 (2022). Because these employees had no idea the applications were inaccurate, the registrations can support Beatriz Ball's infringement action. *See id.*

Courts routinely use § 411(b)(1) to overlook similar good faith errors and allow suits to proceed under the proper claimant's name. *See Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1155–56 (9th Cir. 2010) (sole shareholder named instead of corporation); *Thomas Wilson & Co. v. Irving J. Dorfman Co., Inc.*, 433 F.2d 409, 412 (2d Cir. 1970) (president of corporation named instead of corporation); *Morelli v. Tiffany & Co.*, 186 F. Supp. 2d 563, 565 (E.D. Pa. 2002) (owner named instead of corporation); *see also One Treasure*, 202 F.App'x at 660 ("Courts have repeatedly excused a wide range of errors, . . . including misidentification of copyright claimant[.]"); NIMMER, *supra*, at § 7:20 ("[C]ases have forgiven even . . . erroneous statements as to the identity of the author, or of the copyright claimant.").[5]

---

[5] Deciding standing under § 411(b)(1) here does not require referring the issue to the Register of Copyrights pursuant to § 411(b)(2), which requires the Register to determine materiality only if there is an allegation that the misstatement was both material *and* knowing. 17 U.S.C. § 411(b)(2) ("[A]ny case in which inaccurate information described under paragraph (1) [knowing and material misstatement] is alleged."); *see* NIMMER, *supra*, § 7:20 (explaining that § 411(b)(2) applies when "parties to a case allege deliberate misstatement in the registration certificate"). This is how courts have consistently interpreted the requirement. *Compare Jules Jordan Video*, 617 F.3d at 1156 (no allegation the misstatements were knowing and no referral to the Copyright Office); *Thomas Wilson & Co.*, 433 F.2d at 412 (same); *Morelli*, 186 F. Supp. 2d at 565–66 (same), *with DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 623–24 (7th Cir. 2013) (allegation of knowing and material misstatement referred to the Register). The statute does not require the Register to make materiality determinations even if the misstatements were, as here, made unknowingly. And because unknowing misstatements do not defeat

The identity error in this case is the precise situation § 411(b)(1) addresses.  Beatriz Ball, LLC had standing[6] to bring this suit as the actual copyright holder pursuant to that provision.  Accordingly, we need not discuss whether the assignment to Beatriz Ball, LLC should have been interpreted under state or federal law or whether it authorized the assignee to pursue infringement claims predating the assignment.  *See Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698, 699–700 (5th Cir. 1969); *Di Angelo Publications, Inc. v. Kelley*, 9 F.4th 256, 260 (5th Cir. 2021); *Hacienda Recs., L.P. v. Ramos*, 718 F.App'x 223, 233 (5th Cir. 2018) (unpublished).

## II.     Trade Dress

Beatriz Ball next challenges the district court's conclusion that its "Organic Pearl" trade dress is not protectible under the Lanham Act.  The Lanham Act creates a cause of action for trade dress infringement, which is analogous to the common law tort of unfair competition.  *Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989).  "Trade dress" refers to a product's total image and overall appearance.  *Laney Chiropractic and Sports Therapy, P.A. v. Nationwide Mutual Ins. Co.*, 866 F.3d 254, 261 (5th Cir. 2017).  "In general, the Act prohibits a manufacturer from 'passing off' his goods or services as those of another maker by virtue of substantial similarity between the products."  *Blue Bell Bio-Med*, 864 F.2d at 1256.  To prevail on its trade dress infringement claim, Beatriz Ball must prove that: (1) its trade dress qualifies for protection; and (2) the trade dress has been

---

the registrations' validity, both judicial efficiency and preserving the Register's limited resources support courts' addressing materiality.

[6] It goes without saying that this issue is one of statutory rather than Article III standing.  *HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 339 (5th Cir. 2021) (explaining that statutory standing is considered an element of the claim addressed at the pleading stage under Rule 12(b)(6)).

infringed by demonstrating a likelihood of confusion in the minds of potential consumers. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 (5th Cir. 2010). Because the district court here determined that Beatriz Ball's Organic Pearl collection lacked the acquired distinctiveness of protectible trade dress, it did not reach the issue of infringement.

Importantly, Beatriz Ball's trade dress is unregistered. The Supreme Court has held that, "in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216, 120 S. Ct. 1339, 1346 (2000). Secondary meaning is established when, "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Id.* at 211, 120 S. Ct. at 1343 (internal quotation marks omitted). Beatriz Ball's "burden of demonstrating secondary meaning is substantial and requires a high degree of proof." *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 190 (5th Cir. 2018) (internal quotation marks omitted). In the context of trade dress, the Fifth Circuit has articulated seven factors to consider in determining whether secondary meaning has been shown:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

*Amazing Spaces*, 608 F.3d at 248 (internal quotation marks omitted). "Because the primary element of secondary meaning is a mental association in buyers' minds between the alleged mark and a single source of the product,

No. 21-30029

the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry." *Id.* (internal quotation marks omitted).

Whether Beatriz Ball's trade dress has acquired secondary meaning is considered a question of fact reviewed on appeal for clear error. *Id.* at 234. The court systematically examined each of the seven factors and found only the first factor—length and manner of the use of the "trade dress"—definitely in favor of Beatriz Ball's claim. Most of the other factors weighed against the claim as the court saw it, and plaintiff offered no evidence on the consumer survey factor. Nevertheless, a careful review of the record here demonstrates that the district court clearly erred in analyzing three of the factors: volume of sales, the nature of use of Organic Pearl trade dress in newspapers and magazines, and the defendant's intent in copying the trade dress. We take each of these factors individually.[7]

### A.     *Volume of Sales*

Because the district court perceived that Beatriz Ball only introduced evidence of total company sales and no evidence of "sales attributable to the

---

[7] The district court determined that the "direct consumer testimony" factor should be counted against Beatriz Ball, and we agree. Beatriz Ball did not offer direct consumer testimony at trial and cannot be entitled to a favorable finding on this factor. But the court erred in considering testimony (offered by corporate salespeople, not consumers) indicating *consumer confusion.* Consumer confusion delves into the likelihood of confusion element of trade dress infringement and is not relevant for purposes of secondary meaning. *Amazing Spaces*, 608 F.3d at 235–236. *See id.* at 249 (noting that instances of consumer confusion bear on the merits of trade dress claims, but "do not have relevance as to the secondary meaning" of the trade dress).

At trial, Beatriz Ball provided testimony of consumer association from its sales representatives, but this is not direct consumer testimony. Second-hand observations of consumers may sometimes be relevant to this inquiry, but they are by definition not direct consumer testimony and are insufficient on their own. This is especially true here, where the only testimony provided is from interested parties who work with or for the plaintiff. Thus, even though the district court improperly analyzed this factor, the error is harmless in the absence of actual consumer testimony.

Organic Pearl collection," it determined that the "volume of sales" factor counted against finding secondary meaning. It reasoned that it could not evaluate the success of the trade dress in the market without knowing the volume of sales specific to the Organic Pearl collection. This would have been an acceptable inference but for the fact that Beatriz Ball offered evidence of the exact volume of sales attributable to the Organic Pearl collection.

The most precise version of this evidence is a chart that lists the sales from the Organic Pearl collection for each year from 2009 to 2019. According to this chart, Beatriz Ball sold $6.6 million worth of Organic Pearl pieces in total. The district court declared that the chart was unhelpful since it only "purported to show the total sales of Plaintiff's products from 2009 through September 2019" rather than sales attributable to the Organic Pearl collection. The court misunderstood that the chart does represent sales attributable to the Organic Pearl collection.

Admittedly, the chart is not clearly labeled and, perhaps in isolation, such a mischaracterization would not be clear error. But the chart was not the sole evidence of Organic Pearl sales. For example, one of Beatriz Ball's general managers testified that sales from the Organic Pearl collection from the last 10 years totaled just over $6.6 million. The same $6.6 million total was also attributed to the Organic Pearl collection in sworn declarations during the summary judgment briefing. Thus, the volume of Organic Pearl sales was solidified in this record.

Accordingly, whether this multimillion-dollar volume of sales ultimately weighs for or against secondary meaning should be reconsidered. No current circuit precedent expressly addresses a $6.6 million volume, but two cases uphold much higher volumes and one rejects a much lower volume as indicia of secondary meaning. *See Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 477 (5th Cir.

2008) (counting $93 million per year in favor of secondary meaning); *Viacom*, 891 F.3d at 191 (counting $470 million from two films featuring the trade dress in favor of secondary meaning); *Nola Spice Designs*, 783 F.3d at 544 (counting $30,500 over 6.5 years against secondary meaning). On remand, the district court must decide whether this sales volume over ten years in the handmade, heirloom-quality tableware market favors finding secondary meaning.

> ### B. *Nature of use of the mark or trade dress in newspapers and magazines*

In considering the "nature of use in newspapers and magazines" factor, courts consider to what extent third-party media have reported on the purported trade dress. *Nola Spice Designs*, 783 F.3d at 546; *Viacom*, 891 F.3d at 191; *Smack Apparel Co.*, 550 F.3d at 477. The district court counted this factor against Beatriz Ball after analyzing the company's general advertising and self-promoting efforts, which it had already considered under the advertising factor. On appeal, Beatriz Ball cites various examples of publications that featured third-party promotions of Organic Pearl pieces. This evidence deserves consideration. It is incumbent on the district court to discern whether these publications "impact[ed] . . . public perception" of the trade dress. *Nola Spice Designs*, 783 F.3d at 546. The district court clearly erred by evaluating the wrong evidence relevant to this factor.

It is also important that the *name* "Organic Pearl" need not be associated with Beatriz Ball. What matters is whether the *specific features* of the "Organic Pearl" collection are associated with Beatriz Ball. In its analysis of the "newspaper and magazines" factor, the district court observed that "very few of the advertisements reference the collection by name and just as many advertisements highlight Beatriz Ball pieces from other collections." As Beatriz Ball points out, however, "[t]his is not a suit over rights to a name; it's a suit over rights to product designs." For each of the seven factors, "the

focus is on how [the evidence] demonstrates that the meaning of the *mark or trade dress* has been altered in the minds of consumers." *Amazing Spaces*, 608 F.3d at 248 (internal quotation marks omitted) (emphasis added). Accordingly, the features of the *design* are paramount to developing secondary meaning in the minds of the consuming public.

### C.     *The defendant's intent in copying the trade dress*

For this factor, the "relevant inquiry is whether [defendant] intended to derive benefits from [plaintiff]'s reputation by using the [trade dress]." *Viacom*, 891 F.3d at 195–96. "Evidence that a defendant intends to 'pass off' its product as that of another can be found through imitation of packaging, similar distribution methods, and more." *Id.* at 196. The district court did not address intent directly, but rather counted this factor against Beatriz Ball by finding that there was no "evidence of direct copying by Pampa Bay."

The district court's conclusion was partially based on its observation of "widespread use of the alleged trade dress in the tabletop industry." Defendant's trial exhibits included various products from other manufacturers, each featuring some type of pearl rim and/or distorted features. The district court determined that the similarities among the products showed that the trade dress is not specific to Beatriz Ball. We disagree.

A company's trade dress consists of the totality of features and overall appearance. *Blue Bell Bio-Med*, 864 F.2d at 1256 ("The 'trade dress' of a product is essentially *its total image and overall appearance*." (emphasis added)). Here, the district court isolated features of the Organic Pearl collection and found that other products that share one or two of those features embody the trade dress. But Beatriz Ball's trade dress claim is not confined to products that include a pearl rim or that might include some distortions in the product's shape. As described, the trade dress exhibits a

unique *combination* of features pertaining to the individuality of each piece, the irregular and unpredictable size and shape of the pearls, the undulated shape of the body, the metallic shine, and the overall, accurate impression that each piece was handmade with artisanal quality. None of the products presented at trial incorporated these elements holistically like the Pampa Bay products.[8] The district court should have compared the total integration of features comprising the Organic Pearl trade dress with the Pampa Bay products. *Amazing Spaces*, 608 F.3d at 251 (internal quotation marks omitted) ("The existence of non-distinctive elements does not eliminate the possibility of inherent distinctiveness in the trade dress as a whole.").[9]

The district court also erroneously relied on testimony suggesting a difference in quality between the products produced by Pampa Bay and Beatriz Ball. It determined that this testimony supported its finding that there was no copying. But the Lanham Act's purpose is to protect against infringers who copy a party's trade dress and infuse the market with lesser quality versions, thus confusing the relevant consumers and diluting the plaintiff's reputation.

> Protection of trade dress, no less than of trademarks, serves the
> Act's purpose to secure to the owner of the mark the goodwill

---

[8] Perhaps the closest are the Lenox products, which still lack total incorporation of the trade dress since most of these products lack the metallic shine and are more uniform and regular in appearance. Nevertheless, the record shows that Lenox discontinued this line of products after Beatriz Ball complained of its infringement.

[9] "A competitor can use elements of [plaintiff's] trade dress, but [plaintiff] can protect a combination of visual elements that, taken together may create a distinctive visual impression. [Defendant] may enter the upscale Mexican fast-food market, but it may not copy [plaintiff's] distinctive combination of layout and design features. [Defendant's] imitation reflects not merely components of Taco Cabana's trade dress, but its distinctive integration of components." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1118 (5th Cir. 1991), *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S. Ct. 2753 (1992) (internal citations and quotation marks omitted).

of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S. Ct. 2753, 2760 (1992). Thus, a difference in quality between the products does not support a finding that there was no copying.

Ultimately, a visual comparison of Pampa Bay's products to the Organic Pearl line makes it difficult to deny that there was intent to copy. The designs are not just alike, they are indistinguishable in some cases. When two product designs are so very similar, an inference of intent is permissible. Moreover, evidence of deliberate copying can be a weighty factor if it appears the copying attempted to benefit from the perceived secondary meaning. *See Ferrari S.P.A. v. Roberts,* 944 F.2d 1235, 1239 (6th Cir. 1991) (citing *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.,* 283 F.2d 551, 558 (9th Cir. 1960)). The district court clearly erred in concluding otherwise.

The sum of errors in the district court's analysis of secondary meaning requires reconsideration of the evidence and overall re-weighing of the factors in accordance with this opinion. In requiring reconsideration on remand, however, we do not prescribe the outcome of these complex and interesting claims.

## CONCLUSION

For the foregoing reasons, we REVERSE and REMAND the judgment of the district court for further proceedings as detailed above.

Gregg Costa, *Circuit Judge*, specially concurring:

I fully join the court's opinion, which correctly concludes that Beatriz Ball has statutory standing and that the secondary meaning analysis should be reconsidered. I write separately to remark on how our remand of the trade dress claim reveals a paradox that has perplexed me about bench trials: We give a trial judge's detailed and intensive factfinding less deference than a jury's unexplained verdict.

If a jury had rejected Beatriz Ball's trade dress claim—giving no more explanation than a simple "No" on the verdict form—we would presumably affirm. After all, we do not hold that Beatriz Ball is entitled to judgment as a matter of law on this claim. Instead, we remand for the district court to reassess the trade dress claim because of some errors in its 33 pages explaining why it found no protectable trade dress.

One might think that having to explain a decision helps insulate it from review. Isn't a decision stronger when supported by reasons? One might also think that appellate judges reviewing trials would be more deferential to their judicial colleagues, who are steeped in the law, than to lay jurors. *See* Edward H. Cooper, *Civil Rule 50(a): Rationing and Rationalizing the Resources of Appellate Review*, 63 Notre Dame L. Rev. 645, 650 (1988) (observing that greater appellate scrutiny of bench trials "seems surprising since judges are trained professionals who constantly gain experience with . . . our rules of adversary trial, while jurors ordinarily are amateurs without substantial experience"). But neither is true.

The requirement that a trial judge explain findings, Fed. R. Civ. P. 52(a)(1), ends up making bench trials more susceptible to reversal. We review judges' findings for clear error. Fed. R. Civ. P. 52(a)(6). That standard defers to the factfinder but not as much as the standard for jury trials, which allows reversal "[o]nly when there is a complete absence of

probative facts to support the conclusion reached." *See Lavender v. Kurn*, 327 U.S. 645, 653 (1946). In essence, trial judges are rewarded for their time-consuming and thorough explanations with less deference on appeal. Why does more work translate to less deference?

As it turns out, it was not always the case that a judge's findings received less deference than a jury verdict. Before 1938, the standard of review applied to a judge's findings depended on whether the case was at law (before the judge because the parties waived a jury) or in equity. *See* 9C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2571 (3d ed. 2022); Robert L. Stern, *Review of Findings of Administrators, Judges and Juries: A Comparative Analysis*, 58 Harv. L. Rev. 70, 79–80 (1944). For an action at law, a judge's findings of fact "were as conclusive, upon review, as a verdict of a jury." *Aetna Life Ins. Co. v. Kepler*, 116 F.2d 1, 4–5 (8th Cir. 1941); Stern, *supra*, at 80 & n.47 (noting that this standard of review was required by Revised Statutes §§ 649, 700 (1875)); *see also United States v. U.S. Fid. & Guar. Co.*, 236 U.S. 512, 527 (1915). In contrast, actions in equity were reviewed for clear error.[1] Stern, *supra*, at 80; *see D.C. v. Pace*, 320 U.S. 698, 701–02 (1944); *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

This dichotomy fell by the wayside with the Federal Rules of Civil Procedure's merger of law and equity practice. 12A Wright & Miller, *supra*, Civ. App. B (2021 ed.) (Supreme Court Order); 4 *id.* §§ 1004, 1041 (4th ed.). Left to be decided, however, was whether the legal or equitable standard of review would be the uniform one. 9C *id.* § 2571. Although the

---

[1] Originally, the findings of equitable chancery courts were reviewed de novo. 9C Wright & Miller, *supra*, at § 2571. As the law developed, however, the findings of equitable courts came to have "great weight with the appellate court but were not conclusive." *Id.*

decision was not unanimous, the Committee ended up going with "the broader equity review to the narrower review at law." *Id.*; *but see* Charles E. Clark & Ferdinand F. Stone, *Review of Findings of Fact*, 4 U. Chi. L. Rev. 190, 216-17 (1937) (advocating for the review at law).

Rule 52(a) was the result. *See* Stern, *supra*, at 80. Adopting "the then prevailing equity practice," the rule prescribed—as it does today—that a trial court's findings of fact can be set aside for clear error. *U.S. Gypsum Co.*, 333 U.S. at 394–95; *see* Fed. R. Civ. P. 52 advisory committee's note to 1937 adoption. That makes appellate review of judges' factfinding less deferential than it is for jury verdicts. *See U.S. Gypsum Co.*, 333 U.S. at 394–95; 9C Wright & Miller, *supra*, § 2571. It is also less deferential than judicial review of agency factfinding, *see U.S. Gypsum Co.*, 333 U.S. at 395; Stern*, supra*, 84–86. That means our scrutiny is greater of trial judges than of any other factfinders we review.

Courts and scholars have attempted to explain this seeming anomaly. Some go as far to say that the Seventh Amendment *requires* jury verdicts to receive more deference than judges' findings. *See Reynolds v. City of Chicago*, 296 F.3d 524, 526-27 (7th Cir. 2002) ("[C]ases say that in a federal civil case, by virtue of the Seventh Amendment, reviewing courts owe more deference to a jury's findings than to findings by a judge.") (citing *Pace*, 320 U.S. at 701). But that cannot be the case. A constitutional requirement of deference to jury trials does not preclude the same deference for bench trials. As noted, the pre-Federal Rules practice provided equal deference for actions at law: "Where a case is tried by the court, a jury having been waived, its findings upon questions of fact are conclusive in the courts of review, it matters not how convincing the argument that upon the evidence the findings should have been different." *Dooley v. Pease*, 180 U.S. 126, 131 (1901).

So it is by choice that the federal rules afford less deference to bench trials. But while the Seventh Amendment does not compel the backwards-seeming rule giving less deference to judges' findings, it does explain it. "[O]ur traditional and constitutionalized reverence for jury trial" is why we trust juries more. Cooper, *supra*, at 650. As the Supreme Court put it at a time when only men served on juries: "It is assumed that twelve men know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge." *Sioux City & Pac. R.R. Co. v. Stout*, 84 U.S. (17 Wall.) 657, 664 (1873). Modern psychology confirms this long-held intuition. *See generally* James Surowiecki, The Wisdom of Crowds: Why the Many Are Smarter Than the Few and How Collective Wisdom Shapes Businesses, Economies, Societies, and Nations (2004).

The wisdom of juries comes from their decisions being "made by persons embodying the underlying sense of fairness of the community, rather than by a single man, no matter how expert, who might have arbitrary notions of his own." *See* Stern, *supra*, at 81. The law recognizes this value of collective decisionmaking in another way. Panels of judges decide cases on appeal, with more judges the higher a case goes up the judicial hierarchy. *Id.* at 82 (recognizing that appellate courts "have the advantage of the collaboration and interchange of ideas of three or more men"). Collective wisdom thus favors greater appellate scrutiny of bench trials. While for jury trials the larger crowd exists at the trial level, for bench trials the larger crowd is at the appellate stage.

It turns out, then, that there is good reason for the seeming anomaly of giving less deference to bench trials: Larger and more representative groups are the ones more likely to reach the correct outcome.