# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2023

Lyle W. Cayce
Clerk

No. 22-20345

Corporativo Grupo R SA DE C.V.,

*Plaintiff—Appellant*,

*versus*

Marfield Limited Incorporated; Shanara Maritime International, S.A.,

*Defendants—Appellees*,

Caterpillar Financial Services Asia Pte Ltd; Eksportfinans ASA; The Norwegian Government, represented by the Norwegian Ministry of Trade and Industry and Eksportkreditt Norge AS; KFW IPEX-Bank GmbH,

*Intervenors—Appellees*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:19-CV-1963

---

No. 22-20345

Before WIENER, STEWART, and ENGELHARDT, *Circuit Judges*.
JACQUES L. WIENER, JR., *Circuit Judge*:

Plaintiff-Appellant Corporativo Grupo R SA DE C.V. ("Grupo R") appeals some of the district court's findings of fact and conclusions of law following a January 2022 bench trial. Grupo R asserts that the district court erred by (1) incorrectly interpreting and applying vessel mortgage recordation requirements under Panamanian law and (2) recognizing specific lien claims by parties who failed to obtain substitute security following the judicial sale of a vessel. We AFFIRM.

## I. Factual Background

In 2008, Intervenors-Appellees Caterpillar Financial Services Asia Pte Ltd ("Caterpillar") and Eksportfinans ASA ("Eksportfinans") provided a loan to Marfield Limited Incorporated ("Marfield") for the construction of an offshore construction vessel named the M/V CABALLO MAYA ("MAYA"). To secure payment of this loan, Marfield executed and delivered a First Preferred Naval Mortgage to Eksportfinans and a Second Preferred Naval Mortgage to Caterpillar on December 19, 2008. As further security for outstanding sums owed to Caterpillar, Marfield executed a Third Preferred Naval Mortgage on April 17, 2014, encumbering the whole of the MAYA. The MAYA was flagged in Panama, so all three of those mortgages were submitted to the Panama Maritime Authority Directorate General of Public Registry of Property of Vessels ("PMA"), which is the central office for the recordation of Panamanian ship mortgages. The PMA reviewed all three mortgages twice and accepted them for recordation.

In 2012, Caterpillar and Intervenor-Appellee the Norwegian Government ("Norway") provided a loan to Shanara Maritime International S.A. ("Shanara") for construction of another offshore construction vessel named the M/V CABALLO MARANGO ("MARANGO"). To secure this

2

No. 22-20345

loan, Shanara executed and delivered a First Preferred Naval Mortgage to Caterpillar and Norway on February 9, 2012. The following year, KFW IPEX-Bank GmbH ("KFW") provided a loan to Shanara to finance the acquisition of cranes for installation aboard the MARANGO. To secure payment of this loan, Shanara executed and delivered a Second Preferred Naval Mortgage to KFW on January 24, 2013. The MAYA was also flagged in Panama, so both mortgages were submitted to the PMA, which reviewed the mortgages twice and accepted them for recordation.

Once construction of the MAYA and MARANGO was completed, Marfield and Shanara chartered the vessels to Oceanografia S.A. de C.V. ("Oceanografia") for use in Mexico. The MAYA and the MARANGO were chartered there until early 2014, when the Mexican government seized the vessels in conjunction with its criminal investigation of Oceanografia. On February 28, 2014, Marfield and Shanara terminated their bareboat charters of the vessels with Oceanografia, and the vessels remained in the Mexican government's custody. Shanara and Marfield could not generate revenue on the vessels and began to fall behind on their loan payments to Intervenors-Appellees Caterpillar, Norway, KFW, and Eksportfinans (collectively, the "Lenders"). Shortly after that, bankruptcy proceedings were commenced against Oceanografia in Mexico, and, on April 10, 2014, the Mexican government separately seized the MAYA and MARANGO in connection with the bankruptcy.

In early 2014, Grupo R, a Mexican conglomerate in the oil, gas, and energy sector, initiated discussions with Marfield and Shanara to purchase the MAYA and MARANGO. On March 21, 2014, the parties entered into purchase agreements for the vessels. Shanara and Marfield were subsequently unable to obtain the release of the vessels from the Mexican government, which violated the deadlines set forth in the purchase agreements. Since the agreements are governed by English Law and contain

a London Maritime Arbitration Association dispute resolution clause, Grupo R initiated a London arbitration against Shanara and Marfield. Grupo R prevailed, and on May 30, 2019, a London Arbitration Panel entered awards of $5,000,000 against Marfield and $5,000,000 against Shanara.

From the initial arrest of the vessels until December 2017, the Lenders executed a number of amendments to the original loan agreements to reaffirm Marfield's and Shanara's payment obligations, which remained unfulfilled. On July 10, 2015, the Lenders, Marfield, and Shanara executed two Standstill Agreements in which Shanara and Marfield admitted that their cancellation of the Oceanografia charters constituted "materially adverse" events of default under their respective loan agreements. To avoid the imposition of liens over the MAYA and MARANGO, Caterpillar provided additional financing to Marfield and Shanara in the form of four "protective advances," or loans. In return, Marfield and Shanara executed four Preferred Naval Mortgages in favor of Caterpillar to secure the outstanding amounts due, then registered those mortgages with the PMA. The PMA reviewed each of the mortgages twice, then accepted them for recordation. Since 2014, Shanara and Marfield have made no loan payments to the Lenders on any of the nine mortgages issued.

## II. Proceedings Below

On May 30, 2019, Grupo R filed suit in the U.S. District Court for the Southern District of Texas seeking to attach the MAYA and MARANGO under the Texas Civil Practice and Remedies Code Section 61.001, *et seq.* Grupo R requested that the court attach the vessels so they could be sold at judicial auction to satisfy Grupo R's arbitration awards. Grupo R attached a Certificate of Ownership and Encumbrance to its Complaint, identifying the First, Second, and Third Preferred mortgages over the MAYA and the

No. 22-20345

MARANGO. At the time, the MAYA and MARANGO had been released from Mexican seizure and were located in Galveston, Texas.

The district court granted Grupo R's motion to attach the MAYA and MARANGO on June 4, 2019. Shortly thereafter, the Lenders moved to intervene in the case to assert their rights, seeking judgment against Marfield and Shanara *in personam* and the MAYA and MARANGO *in rem*. The Lenders caused the vessels to be re-arrested pursuant to Rule C of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.[1] Marfield and Shanara then filed an answer and counterclaim against the Lenders for declaratory judgment, fraud, and wrongful arrest.

On April 22, 2020, the district court ordered the United States Marshals Service to put the MAYA and MARANGO up for sale at a judicial auction. At the auction, the MAYA was sold to Karadeniz Holding for the price of $1,700,000, which the district court confirmed on January 7, 2021. Caterpillar, which had been authorized by the court to credit bid the amount of its debt, was the successful high bidder on the MARANGO for $5,000,000. The court ordered Caterpillar to file a security bond in the amount of $4.95 million to confirm the sale of the MARANGO. Caterpillar filed the security bond on November 15, 2021, but Grupo R objected to its language. Grupo R expressed concern that the security bond would prevent Grupo R from collecting against the bond if the Lenders' mortgages were ruled unenforceable against third parties like Grupo R. The district court directed Caterpillar to amend the bond in open court to assuage Grupo R's concerns, and the parties executed an amended bond (the "Amended Bond").

---

[1] Fed. R. Civ. P. Supp. R. C.

No. 22-20345

On January 4, 2022, Grupo R, Marfield, and Shanara filed a stipulation of various facts, agreeing that the London arbitration awards were subject to enforcement and recognition under the New York Convention. The district court then entered an order and judgment recognizing and confirming the London arbitration awards. With this resolved, the parties could proceed to trial.

On January 18, 2022, a three-day bench trial commenced to determine the priority of the Lenders' foreign ship mortgages and Grupo R's state-created liens, as well as the enforceability of the Lenders' mortgages. At trial, Marfield and Shanara presented testimony from the parties' corporate representatives, while the Lenders and Grupo R presented testimony from two Panamanian law experts, Jorge Loaiza for Grupo R, and Margareth Mosquera for Lenders. On June 7, 2022, the court issued its findings of fact and conclusions of law, holding, in relevant part, that (1) Marfield and Shanara are in default under the loan agreements; and (2) the Lenders' preferred ship mortgages related to said default outrank Grupo R's state-created liens arising from Grupo R's attachment of the MAYA and MARANGO under Texas state law. Grupo R timely appealed.[2]

## III. Standard of Review

Following a bench trial, the district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*.[3] "So

---

[2] Marfield and Shanara are no longer parties to this case because the MAYA and MARANGO were sold before trial and final judgment. Marfield and Shanara expressly waived the opportunity to file briefs on behalf of those vessels in a letter to this court dated November 14, 2022. *See* Letter from Robert E. Booth in re: Cause No. 22-20345, November 14, 2022.

[3] *See Barto v. Shore Constr.*, LLC, 801 F.3d 465, 471 (5th Cir. 2015) (quoting *Becker v. Tidewater*, Inc., 586 F.3d 358, 365 (5th Cir. 2009)); *Beatriz Ball, L.L.C. v. Barbagallo Co.*,

No. 22-20345

long as the 'district court's account of the evidence is plausible in light of the record viewed in its entirety,' its findings must be affirmed, even if the court of appeals might 'have weighed the evidence differently.'"[4]

The district court's determination of foreign law pursuant to Rule 44.1 of the Federal Rules of Civil Procedure is a question of law subject to *de novo* review.[5] When determining an issue of foreign law under Rule 44.1, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."[6] Although treated as a question of fact at trial, on appeal, "[t]he court's determination must be treated as a ruling on a question of law."[7]

## IV. Discussion

Grupo R makes two primary arguments on appeal. First, it asserts that the district court erred by incorrectly applying and interpreting Panamanian law in its determination of the relative priority of the parties' lien claims. Second, Grupo R contends that the district court erred by recognizing Caterpillar's and KFW's lien claims in connection with the credit sale of the

---

*L.L.C.*, 40 F.4th 308, 315 (5th Cir. 2022) (citing *Preston Expl. Co., L.P. v. GSF, L.L.C.*, 669 F.3d 518 (5th Cir. 2012)).

[4] *Bates Energy Oil & Gas, L.L.C. v. Complete Oil Field Services, L.L.C.*, No. 20-50952, 2021 WL 4840961 (5th Cir. Oct. 15, 2021) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

[5] *See Iracheta v. Holder*, 730 F.3d 419, 423 (5th Cir. 2013); *Banco de Credito Indus., S.A. v. Tesoreria Gen.*, 990 F.2d 827, 832-33 (5th Cir. 1993); FED. R. CIV. P. 44.1.

[6] FED. R. CIV. P. 44.1.

[7] *Id.*; *see also Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 713 (5th Cir. 1999) (citing FED. R. CIV. P. 44.1); *Perez & Compania v. M/V Mexico I*, 826 F.2d 1449, 1450 (5th Cir. 1987).

No. 22-20345

MARANGO when they failed to obtain substitute security following the sale. These arguments are discussed in turn below.

A. *Relative priority of the Lenders' mortgages as to Grupo R's state-created liens*

On appeal, the parties dispute whether the Lenders' liens created by the nine ship mortgages take priority over Grupo R's liens that arose from the attachment of the MAYA and MARANGO under Texas state law. The relative priorities of the Lenders' and Grupo R's rights determine how the proceeds from the judicial sale of the MAYA and MARANGO should have been allocated.[8] The law of the forum provides the relative rankings of the liens, while Panamanian law governs the substance of the liens.[9] The ranking of liens in the United States, from highest priority to lowest priority, is as follows:

1. ***Custodia legis* expenses;**
2. Seamen's liens for wages;
3. Salvage and general average liens;
4. Tort liens;
5. **Preferred ship mortgage liens;**
6. Liens for necessaries under CIMLA;
7. **State-created liens that are maritime in nature;**
8. Maritime liens for penalty/forfeiture for violation of federal statutes;
9. Perfected non-maritime liens;
10. Attachment liens;

---

[8] *United States v. (One) 1 254 Ft. Freighter, M/V ANDORIA*, 570 F. Supp. 413, 415 (E.D. La. 1983), *aff'd*, 768 F.2d 597 (5th Cir. 1985).

[9] *Banco de Credito Indus.*, 990 F.2d at 832.

No. 22-20345

11.  Maritime liens in bankruptcy.[10]

"Once competing liens have been ranked according to class, the top priority liens will of course be paid first."[11] Moreover, "[i]f the funds are insufficient to pay the next lower ranked class in full, the available funds will be distributed among claimants in that class according to rules operating within that class."[12]

Under this ranking regime, Grupo R's rights are classified as "state-created liens that are maritime in nature," while the Lenders' liens are classified as "preferred ship mortgages." Grupo R's liens arose when it caused the MAYA and MARANGO to be attached under Texas state law. The Lenders' mortgage liens, on the other hand, arose when Shanara and Marfield failed to pay the mortgages over the MAYA and MARANGO, which had been executed in Panama and registered with the PMA.[13] The Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*, defines a preferred ship mortgage as a:

> mortgage . . . established as a security on a foreign vessel if the mortgage . . . was executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and has been registered under those laws in a public register at the port of registry of the vessel or at a central office.[14]

---

[10] *M/V ANDORIA*, 570 F. Supp. at 415.

[11] *Id.* at 415 (citing *Rayon Y. Celanese Peruana v. M/V PHGH*, 471 F. Supp. 1363 (S.D. Ala. 1979)); *see also* G. Varian, *Rank and Priority of Maritime Liens*, 47 Tul. L. Rev. 751 (1973); G. GILMORE AND C. BLACK, THE LAW OF ADMIRALTY, 596 (2d ed. 1975).

[12] *M/V ANDORIA*, 570 F. Supp. at 415.

[13] 46 U.S.C. § 31301(6)(B).

[14] *Id.*

No. 22-20345

The parties do not dispute that the Lenders' preferred ship mortgage liens outrank Grupo R's state-created maritime attachment liens, and the district court confirmed those rankings in its findings of fact and conclusions of law.[15] The threshold issue on appeal is whether the Lenders' mortgages are valid and enforceable against third parties like Grupo R, allowing Lenders to exercise their priority over the proceeds of the judicial sale of the MAYA and MARANGO.

### B. *Validity and enforceability of the preferred ship mortgages under CIMLA and Panamanian law*

Grupo R and the Lenders agree that CIMLA and Panamanian law are implicated in the resolution of this lawsuit. At trial, it was undisputed that (1) the Vessels are registered under Panama's flag; (2) the PMA is the public register or central office charged with recording vessel mortgages in Panama; and (3) all nine of the Lenders' mortgages were recorded with the PMA, reviewed and accepted by the PMA before their recordation, and reviewed again by the PMA when it issued certificates confirming the mortgages' compliance with Panamanian law.

Under CIMLA, "a mortgage on a foreign vessel is preferred so long as it was properly (1) executed and (2) recorded under the laws of the nation in which the foreign vessel is registered."[16] For a preferred ship mortgage, CIMLA provides a cause of action in federal court "[o]n default of any term

---

[15] Grupo R acknowledges the ranking of KFW's preferred ship mortgage lien in relation to its state-created lien but contends that KFW waived its respective "preferred ship mortgage" ranking by failing to seek substitute security following Caterpillar's credit bid for the MARANGO. This is a separate issue that is discussed further below.

[16] *Caterpillar Fin. Servs. Corp. v. IZTACCIHUATL*, 510 F. Supp. 3d 404 (E.D. La. 2020) (citing *Governor & Co. of the Bank of Scotland v. Maria S.J.*, No. 98-1187, 1999 WL 130632, at *2 (E.D. La. Mar. 10, 1999)); *see also* 46 U.S.C. § 31301(6)(B).

of the preferred mortgage."[17] The mortgagee may bring a civil action or an admiralty action *in personam* against the mortgagor or guarantors to recover a deficiency.[18] The mortgagee may also "enforce the preferred mortgage lien in a civil action in rem for . . . a foreign vessel."[19] As noted above, the parties agree that each of the Lender's mortgages was executed in Panama and registered with the PMA. Accordingly, the Lenders' mortgages are properly classified as "preferred ship mortgages" under CIMLA.

The Lenders contend that the inquiry should end here, asserting that CIMLA "does not require Lenders to affirmatively establish all facets of Panama law before their mortgages can be recognized as preferred ship mortgages." However, Grupo R takes the position that these preferred ship mortgages are unenforceable against third parties—such as Grupo R—because they fail to meet the substantive requirements for vessel mortgages under Panamanian law. This highly technical argument is discussed further below.

The parties agree that Article 260 of Law No. 55 of 2008, the Commercial Maritime Law of Panama, governs the substantive mortgage recordation requirements under Panamanian law. The Panamanian government has apparently not issued an official English translation of the full text of Article 260 from the original Spanish version. The parties' Panamanian law experts, Loaiza and Mosquera, offered their own competing English translations of Article 260 at trial and in their expert declarations. Grupo R also pointed out that in 2011, the PMA published a "Merchant

---

[17] 46 U.S.C. § 31325(b)(1).

[18] 1 SCHOENBAUM, ADMIRALTY & MAR. LAW § 9:5 (6th ed. 2020) (citing 46 U.S.C. § 31325(b)(2)).

[19] 46 U.S.C. § 31325(b)(1).

No. 22-20345

Marine Circular MMC-11" in English, which refers to Article 260 and includes a translation of the mortgage recordation requirements. On appeal, the parties dispute the meaning of Article 260's third clause ("Clause 3"), which in its original form states:

> Las fechas de pago del capital o cumplimiento de las obligaciones garantizadas e intereses, o la forma de determinar dichas fechas, salvo que la hipoteca se haya constituido para garantizar obligaciones exigibles a requerimiento, futuras o sujetas a condición suspensiva.

Loaiza's translation of Clause 3 of Article 260 is as follows:

> <u>Dates of repayment of principal</u>, or for satisfaction of the secured obligations, <u>and of interest</u>, or the method to determine such dates, unless the mortgage has been granted to secure obligations payable on demand, in the future or of conditional compliance. (emphasis in original).

Mosquera's translation of Clause 3 is as follows:

> The maturity dates of principal or of compliance with the guaranteed obligations and interest or the form to determine said dates, unless the mortgage is executed as security for obligations repayable on demand, obligations subject to suspensive condition or future obligations.

The Merchant Marine Circular MMC-11's translation of Clause 3 is as follows:

> The dates for the payment of the capital of fulfilment of the secured obligation and interest, or the method used to determine said dates, except if the mortgage is created to secure obligation payable on demand, future obligations or obligations subject to precedent conditions.

On appeal, the parties dispute whether the phrase "[l]as fechas de pago del capital" in the original version means "loan repayment schedule," thereby requiring each registered mortgage to include a loan repayment schedule.

No. 22-20345

Grupo R asserts that all nine of the Lenders' preferred ship mortgages are invalid and unenforceable against third parties because they do not include loan repayment schedules or their corresponding payment dates. At trial, Loaiza testified that "las fechas" literally translates to the plural phrase "the dates," and that none of the preferred ship mortgages include dates of repayment of the loan interest or principal. Loaiza contended at trial that that a strict interpretation of Clause 3 is warranted because Article 9 of the Panamanian Civil Code states: "[w]hen the meaning of the law is clear, its literal word will not be neglected on the pretext of consulting its intent."[20] Loaiza asserts that the Lenders improperly attempted to add "maturity date" into Clause 3 when the literal translation does not support this. Grupo R claims that "[i]f the Panama legislature had intended Article 260, Clause 3 to be satisfied by the inclusion of a mortgage's maturity date alone, they would have signaled that by writing the term 'fecha de vencimiento' into Clause 3's text." Relying on *Mobile Marine Sales, Ltd. v. M/V Prodromos*,[21] a case from another circuit, Grupo R contends that the review and certification of the nine mortgages by the PMA is of little persuasive significance as to their validity.

The Lenders agree that none of the preferred mortgages include loan repayment schedules, but they dispute whether Clause 3 requires such schedules at all. Mosquera took issue with Loaiza's strict interpretation of Clause 3, analogizing it to the Spanish translation of the idiom "it's raining cats and dogs." At trial, Mosquera testified that, although Loaiza's translation of Clause 3 is technically correct, it does not reflect the true

---

[20] Loaiza relied on his own English interpretation of Article 9 in support of this assertion.

[21] 776 F.2d 85, 89 (3d Cir. 1985) ("The certification of due registration by the Public Registry is of limited persuasiveness.").

meaning of Clause 3 under Panamanian law. Mosquera testified that the inclusion of the loan maturity dates in each of the preferred ship mortgages was sufficient under Clause 3, because "the maturity date is actually the date of repayment of the capital and interest of any debt." Mosquera further testified that inclusion of the maturity date is an acceptable and often-used way to satisfy the "dates of repayment of principal, or for satisfaction of the secured obligations, and of interest, or the method to determine such dates" under Clause 3. Mosquera explained that some lenders may choose to include a loan repayment schedule, but that most lenders opt to include only the loan maturity date.

The Lenders alternatively contend that Grupo R had actual and constructive knowledge of the preferred ship mortgages and has not shown that it was prejudiced by the exclusion of loan repayment schedules from the preferred ship mortgages. The Lenders point out that Grupo R acknowledged that all nine mortgages were recorded with the PMA and available for review before initiating this lawsuit. The Lenders also point out that that Grupo R attached Certificates of Ownership and Encumbrance for the MAYA and MARANGO to the initial complaint, and these certificates contained information about the mortgages on the vessels. The Lenders thus contend that Grupo R had both actual and constructive knowledge of the preferred ship mortgages prior to initiating this lawsuit and that the primary purpose of mortgage registration—alerting third parties to the preferred ship mortgages—was achieved.

Under Rule 44.1 of the Federal Rules of Civil Procedure, "[f]ederal courts are competent to make determinations of foreign law."[22] Although

---

[22] *United States v. One Afghan Urial Ovis Orientalis Blanfordi Fully Mounted Sheep*, 964 F.2d 474, 477 (5th Cir. 1992) (citing FED. R. CIV. P. 44.1).

treated as a question of fact at trial, "[t]he court's determination [of foreign law] must be treated as a ruling on a question of law" on appeal.[23] To determine whether a mortgage is valid under foreign law, a court may consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."[24] "Courts frequently accept affidavits from foreign-law experts to guide their analyses of foreign law."[25] When there are conflicting opinions offered by experts on foreign law, "it is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed."[26]

The district court ultimately held that the Lenders' preferred ship mortgages are valid and enforceable under Panamanian law. The court considered testimony from both Loaiza and Mosquera at trial, as well as these experts' corresponding declarations. The court pointed out that Loaiza had contributed to the 2019 and 2021 editions of the *Maritime Law Desk Handbook*, in which he described Clause 3's requirement as "the terms for the payment of principal and interest, **or of the maturity date** or dates for compliance of the obligation secured by the mortgage, except in the case of mortgages granted to secure obligations payable on demand, future or conditional obligations, when such stipulations are not required."[27] Acknowledging its

---

[23] *Id.*; *see also Access Telecom*, 197 F.3d at 713 (citing FED. R. CIV. P. 44.1); *Perez*, 826 F.2d at 1450.

[24] *Banco de Credito Indus.,* 990 F.2d at 833 n.12 (quoting FED. R. CIV. P. 44.1).

[25] *IZTACCIHUATL*, 510 F. Supp. 3d at 410 (citing *McGee v. Arkel Int'l, LLC*, 671 F.3d 539, 546–47 (5th Cir. 2012) (considering affidavits from experts on Iraqi law); *Authenment v. Ingram Barge Co.*, 878 F. Supp. 2d 672, 682 (E.D. La. 2012) (considering affidavit of expert on English law).

[26] *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998) (internal citation omitted).

[27] CHRISTIAN BREITZKE, JONATHAN S. LUX, MARITIME LAW DESK HANDBOOK, Part II. Flag and Registration of Vessels and Mortgages of Vessels (Wolters Kluwer 2019,

authority to make determinations of foreign law pursuant to Rule 44.1, the court stated that it was "not persuaded that a Panama Maritime Court would invalidate [Lenders'] mortgages." The court explained that "the credibility and persuasive force of the opinion of [Lenders'] expert, Margareth Mosquera, are greater than that of Plaintiff's expert, Jorge Loaiza."

The district court directed the allocation of proceeds of the MAYA and the MARANGO pursuant to its conclusions regarding the liens' relative priorities. The proceeds from judicial sale of the MAYA were to be allocated as follows: (1) $63,243.90 to Grupo R and $663,745.12 to Caterpillar for their *custodia legis* lien claims; and (2) any remaining proceeds to Eksportfinans for its First Preferred Vessel Mortgage over the MAYA. The proceeds from the credit sale of the MARANGO were to be allocated to Grupo R in the amount of $63,243.90 for its *custodia legis* lien claims, and the remainder of the Amended Security Bond released to Norway, KFW, and Caterpillar.

Here, the district court sufficiently weighed the experts' competing interpretations of Panamanian law and applied the correct meaning of Clause 3. Both Loaiza and Mosquera are highly experienced and well-credentialed experts in the field of Panamanian law, but the persuasive force of Loaiza's testimony was diminished during the district court proceedings. As noted above, he admitted to publishing a passage in a well-known maritime law treatise in which he endorsed Mosquera's proposed interpretation of Clause 3. During trial, Loaiza testified that this interpretation of Clause 3 only

---

2021) (emphasis added). This text was not introduced into the record as an exhibit, but the district court was authorized to consider it under Rule 44.1 of the Federal Rules of Civil Procedure. FED. R. CIV. P. 44.1. During trial, Loaiza testified that he authored this portion of the treatise.

applies to mortgages that are payable on demand or call for a single "balloon" payment, but he does not offer any evidentiary support for this position.

When considered together, Loaiza's, Mosquera's, and the PMA's translations of Clause 3 do not appear to preclude enforceability solely because a loan repayment schedule was omitted. Grupo R's position appears to ignore the phrase "o cumplimiento de las obligaciones garantizadas e intereses," or, as Loaiza translated it, "or for satisfaction of the secured obligations." According to Mosquera, the PMA and Panamanian attorneys interpret this phrase to mean "maturity date." Thus, it appears that there are two different avenues to achieve compliance with Clause 3: provide a loan repayment schedule *or* provide the maturity date of the loan in question.

We are also not convinced that compliance with Article 260's highly technical requirements is dispositive in this case. We previously held that it is "well established that the validity of a mortgage is dependent only on the existence of a debt actually secured by the mortgage and not on the description of the debt contained in the instrument."[28] Further, other circuits have explained that foreign law plays a more limited role in determining the validity and enforceability of foreign mortgages under CIMLA.[29] In *M/V Prodromos*, the Third Circuit explained that "the stringent procedural requirements for perfecting domestic ship mortgages are not

---

[28] *Tropicana Shipping, S.A. v. Empresa Nacional "Elcano" de la Marina Mercante*, 366 F.2d 729, 733 (5th Cir. 1966) (emphasis added); *see also Merchants Nat. Bank of Mobile v. Ward Rig No. 7, Off. No. 547149*, 634 F.2d 952, 958 (5th Cir. 1981) (citing *Tropicana Shipping* for this same proposition); *State Bank & Tr. Co. v. Lil Al M/V*, No. CV 16-5053, 2018 WL 6326448, at *3 (E.D. La. Dec. 4, 2018).

[29] *Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015, 1023 (3d Cir. 1993) (holding that the Ship Mortgage Act—CIMLA's precursor— "specifically speaks to a limited role for foreign law by making the preferred status of foreign mortgages dependent only on their compliance with the execution and registration requirements of the applicable foreign law").

imposed on foreign ship mortgages . . . to provide a simplified procedure for enforcing mortgages without destroying substantive rights."[30] In fact, Grupo R's heavy reliance on *M/V Prodromos* appears to work against it because the Third Circuit ultimately held that the mortgagees' failure to include a technical requirement—the vessel's navigation license number—did not render the mortgage invalid under Panamanian law.[31]

We conclude that the district court correctly held that the nine preferred ship mortgages at issue are enforceable under CIMLA and Panamanian law, and that the Lenders' preferred ship mortgage liens enjoy priority over Grupo R's state-created maritime attachment liens.

C. *Whether Caterpillar and KFW waived their respective lien positions in relation to the credit sale of the MARANGO*

Grupo R's second primary contention on appeal is that KFW and Caterpillar waived their respective lien positions in relation to the judicial sales of the MAYA and the MARANGO. Grupo R asserts that "Caterpillar made use of a procedural tactic that allowed it to purchase the MARANGO via credit bid, such that no actual monies were provided." Grupo R claims that this provided an unfair benefit to Caterpillar because it was never required to exchange or place any money in the court's registry to stand as the *res*, or substitute security, for the MARANGO after the sale. Grupo R asserts that, by failing to seek substitute security, KFW forfeited its *in rem*

---

[30] 776 F.2d at 89.

[31] *Id.* at 92.

No. 22-20345

lien claim against the MARANGO, and that Caterpillar forfeited its *custodia legis* claim against the MARANGO.

Grupo R claims that, by moving for substitute security following the MARANGO's credit sale, it was the only party to preserve its lien claims. Grupo R insists that the Amended Security Bond responded only to Grupo R's claims and made no exception for Caterpillar's *custodia legis* costs, which arose as a separate claim. Grupo R claims that, as a result, Caterpillar was not entitled to reduce the Amended Security Bond by the amount of its *custodia legis* lien claim. Grupo R further contends that any judgment KFW may now possess exists solely *in personam* against Shanara, as it no longer has a valid lien claim against the Amended Security Bond.

The Lenders counter that it would be absurd to require Caterpillar to lodge security for its own *custodia legis* claim. Moreover, the Lenders contend that KFW's claim against the MARANGO is subject to a stipulation of payment amounts between Caterpillar and KFW under an intercreditor agreement, obviating the need for substitute security. In support, the Lenders reference Rule E(5)(a) of the Supplemental Rules for Admiralty or Maritime Claims, which states that "[w]henever process of maritime attachment and garnishment or process *in rem* is issued the execution of such process shall be stayed, or the property released, on the giving of security, to be approved by the court or clerk, or by stipulation of the parties."[32]

The district court agreed with the Lenders, holding that their interpretation of Supplemental Rule E(5)(a) was correct. The court further held that the intercreditor agreement containing a stipulation of payment between KFW and Caterpillar was sufficient to secure KFW's lien claim against the MARANGO. That court likened the stipulation to a "letter of undertaking,"

---

[32] FED. R. CIV. P. SUPP. R. E(5)(a).

19

which "is customary in the maritime industry" and "is the functional equivalent of a bond for the purpose of securing a claim against a vessel." The district court also noted that Grupo R did not offer any authority for its assertion that a secured creditor's failure to seek substitute security constitutes lien claim forfeiture.

We perceive no merit in Grupo R's alternative arguments and therefore affirm for the same reasons provided by the district court.

## V. Conclusion

For the reasons detailed above, we AFFIRM the district court's findings of fact and conclusions of law with regard to (1) the validity, enforceability, and relative priority of the parties' liens following the judicial sale of the MAYA and MARANGO, and (2) the status of Caterpillar's and KFW's lien positions following the credit sale of the MARANGO.